JOSEPHINE FIRSZT vs. THE CAPITOL PARK REALTY COMPANY.

First Judicial District, Hartford, January Term, 1923.

WHEELER, C. J., BEACH, CURTIS, BURPEE and KEELER, Js.

While proprietors of amusement resorts are not bound to exercise toward their patrons that high degree of care required of a common carrier of passengers, they are required to use the ordinary care of a reasonably prudent person under like circumstances.

The apparatus or devices provided for the recreation or amusement of their visitors—in the present case an aeroplane swing—may involve considerable hazard in operation, and under those circumstances ordinary care would demand more frequent and exact supervision and inspection, than might be required if the element of danger was not present.

If a proper test of the device would have disclosed a defect in its construction, it is of no consequence whether that defect be latent or apparent.

The court said to the jury that the fact that other similar swings were of like construction and operation, would not be a defense, but added that such fact might be considered in determining whether the defendant had used a proper degree of care. *Held* that by such instruction the court gave the defendant all the benefit to which it was entitled from that evidence.

The defendant offered evidence to show that the device was constructed with a high margin of safety. The court charged that such evi-

dence was relevant upon the issue of care exercised in the construction of the device, but was not relevant upon the issue of care exercised in its inspection. *Held* that there was no error in this instruction.

The doctrine of *res ipsa loquitur* applies when, as here, the apparatus is such that ordinarily no injurious operation is to be expected unless from a careless construction, inspection, or user.

If the case be a proper one for the application of this doctrine, the plaintiff in no way loses his right to rely thereon by pleading the particular cause of the accident; but where, as in the present case, the complaint contains only general allegations of negligence, a typical case of reliance upon the doctrine of *res ipsa loquitur* is apparently presented.

The court applied the doctrine simply to carry the plaintiff's case beyond the possibility of a nonsuit, leaving the jury to pass upon the whole case, including the fact of the accident, without mention or explanation of the doctrine, free from all presumptions as to negligence, and with the burden of proof on the plaintiff. *Held* that this treatment of the question afforded the defendant no just cause of complaint.

Argued January 10th—decided March 8th, 1923.

ACTION to recover damages for personal injuries alleged to have been caused by the negligence of the defendant in the maintenance and operation of an "aeroplane swing" in its amusement park, brought to the Superior Court in Hartford County and tried to the jury before *Maltbie, J.;* verdict and judgment for the plaintiff for $10,000, and appeal by the defendant. *Error and new trial ordered.*

*Alexander W. Creedon* and *John A. Danaher*, for the appellant (defendant).

*Charles S. Hamilton*, with whom was *Morris M. Wilder*, for the appellee (plaintiff).

KEELER, J. It appears from the facts admitted by the pleadings, that the defendant on June 5th, 1921, owned and operated an amusement park in the City of Hartford, and invited the public to visit the same

and patronize various forms of amusement therein provided. Among them was a device known as an "aeroplane swing," consisting of cars made to resemble aeroplanes, each of which cars accommodated four persons. Each person riding in one of the cars was charged ten cents—government tax included. Each car was suspended by four steel cables, each fastened at one end to each of the four corners of each swing respectively, and at the other end to steel supports or arms extending out from the top of a steel tower about sixty feet high. The several steel supports or arms at the top of the tower were caused by machinery to revolve in a circle, and this motion in turn by reason of the cables, caused the several cars or swings to revolve, and as the machinery gathered speed the cars would swing out from and around the base of said tower.

The plaintiff offered evidence to prove, and the jury might reasonably have found, that when the boats were in their normal or level condition, and not in operation, they hung by force of gravity perpendicularly from the end of the arms, and were then about eighteen inches from the ground, so that a drop of eighteen inches of either end of a boat would bring it in contact with the ground. This swing was operated by causing a shaft in the central column to revolve by means of an electric motor; when it revolved, the boats by centrifugal force were caused to swing outward away from the central column and at a considerable angle thereto; this, by reason of centrifugal force, and also the atmospheric resistance, caused a considerable strain upon the supporting cables and arms and the supporting rod; and if the boats were operated, as they frequently were, when there was a strong wind blowing, the strain was very much increased and irregular. The method of attaching the outer end of

the suspending arm to the upper part of the inner
column by nothing but a steel rod one and an eighth
inches in diameter, was an insecure, unsafe and danger-
ous method, as the entire strain came on this rod alone,
and if it had any inherent defects in it, it might break
at any time and allow the boats or any one of them to
come down so far as to strike the ground and throw
the occupants out.  At a moderate expense the arm
might have been suspended by steel cables of the same
size, one and one-eighth inches in diameter, running
from the outer end of the arm to the upper collar on
the central column; such a cable would have given
twice the tensile strength of the rod actually used; also
any defect or threatened breakage would be more
easily detected by inspection.

On the said day, at about five o'clock in the after-
noon, by daylight-saving time, the plaintiff paid the
price of admission for herself and her young child, and
they entered one of said boats or cars.  After they took
their seats the apparatus was started by the defendant's
agent and servant, and the boats were set in motion,
revolving around the central tower; centrifugal force
caused the boats to swing outward and brought them
about fifteen feet from the ground when the swing
was operating at full speed, which was at the rate of
about twenty-five miles per hour.  The boats of the
swing were only about half loaded with people at this
time.

Just as the boats were slowing their speed, the rod
holding up the arm to which the cables or wires from
the forward part of the boat in which the plaintiff and
her child were seated, parted and gave way, and the
arm dropped downward, and, as the speed of the ma-
chine lessened and the boat swung in toward the central
column by force of gravity, the forward part of the
boat in which the plaintiff and her child were seated

dropped down to a considerable angle, and finally struck the ground, thereby throwing the plaintiff and her child out.

The plaintiff struck upon the top of her head and her body fell under the boat, which turned over so that a part of it struck the plaintiff on the back near the upper part of the pelvis, as she was lying on the ground, and thereby the injuries from which she was suffering were inflicted.

The jury might reasonably have found from the claimed proof of the defendant substantially as follows: The apparatus was driven by electric power applied through the steel shaft to a collar at the lower end of the uppermost part of the shaft which part revolved carrying the steel arms attached thereto, to the outer end of which arms were attached the cables from which the cars were hung. The revolution of these arms caused the cars to revolve. Each successive application of power applied to the revolving superstructure of the tower accelerated its motion and caused the cars to swing out from the base of the tower. When the cars were revolving at full speed, they described a radius of revolution of about fifty feet from the base of the tower and were then about fifteen feet from the ground. When the power was turned off the boats descended to their normal condition by the force of gravitation. If there had been no defects in the swing it had a margin of safety of 34–4/10 when carrying its full load of twenty-four passengers, when revolving with a radius of fifty feet. The tensile strength of the rod which extended from the crown of the tower to the end of the arm which lowered (which was the rod that broke) if sound would be forty-five thousand pounds. The swing was of the same type and construction as is generally found in amusement parks operated by intelligent, prudent persons.

In the spring of 1921, prior to the opening of the park, the superstructure was examined by a competent mechanical engineer, who visually examined it and applied thereto a tapping test, well recognized in the engineering profession as used to detect loose connections, or defects extending inward from the surface, or outward from the interior of the rod to the surface. About three weeks prior to June 5th, the device was subjected to a loading test when bags were filled with sand and cement and were placed in the boats approximating in weight one and one half to two times the average load of passengers which the boats could carry, and then the boats or cars were revolved at high speed for twenty or twenty-five minutes.

This test was the only practical test reasonably to be expected and generally adopted by intelligent and prudent persons engaged in this business, and the only test open to application by the highest technical skill of the present day, for the purpose of discovering any latent defect, and the reasonable frequency of such tests was once every three months.

Upon each day before the opening of the park and upon June 5th, 1921, the boats were loaded with employees of the park and revolved at full speed for a period of time longer than the ride afforded to the general public. Each day, the operator of the swing inspected the device by climbing to the top and making a visual inspection and examination thereof. These tests were all, and the only, tests reasonably to be expected and generally adopted by intelligent and prudent persons engaged in this business, and were all, and the only, tests open to application by the highest technical skill of the present day.

The dropping of the arm was caused by the breaking of the steel rod which extended from its end to the crown of the structure; and this rod broke at a place

about four or five inches from that end of the rod which was attached to the end of the arm.  The broken surface of the rod showed an irregularly shaped dark spot, and around this and extending to the surface of the rod was a bright metallic surface.   This defect was an inherent defect in the structure of the rod, hidden, concealed, and in no way visible upon examination. It was wholly within the structure of the steel and could not be detected except upon examination by metallurgists in a laboratory, which type of examination cannot be reasonably expected to be exercised by intelligent and prudent men operating such a device in an amusement park.

Of the various errors assigned in the reasons of appeal only those relating to the charge of the court were pursued in brief or argument.

The first claimed error is that the court, in charging the jury, imposed upon the defendant a higher degree or variety of care and duty than is imposed by law; that is, that this care was the same as is required from a carrier of passengers for hire; and not reasonable care in proportion to the danger incurred, which latter care is the one legally imposed.   Upon the question of care required, the court charged as follows: "The standard of care which it was incumbent upon the defendant to exercise was not that care which we have discussed so often in other cases we have had before us, the care of an ordinarily prudent person situated as the particular individual whose activities we were inquiring into was there situated, but it is a higher degree of care; and, that I may not err in stating to you correctly the standard of the care which it was incumbent upon this defendant to exercise, I read to you: 'This defendant was required to exercise'—then follows the really essential words in this definition—' was required to exercise the highest degree of care and skill which may reason-

ably be expected of intelligent and prudent persons engaged in that business, in view of the instrumentalities employed and the dangers naturally to be apprehended. The defendant was not an insurer of the safety of its passengers, and was not bound absolutely and in all events to carry them safely and without injury. The passengers took the risk of their own negligence and took the risk of dangers that could not be averted by the carrier, by the exercise of the degree of care just defined and which may be repeated, the highest degree of care and skill which may reasonably be exercised by an intelligent and prudent person in that business in view of the instrumentalities employed and the dangers naturally to be apprehended.'"

There can be little doubt but that the court intended to define the correct rule of care to be the same as that required of carriers of passengers. The trial judge expressly tells the jury that the care of which he is speaking is not the ordinary care of a prudent person in the conditions obtaining, to which its attention had so often been drawn in other cases, but a higher degree of care, which he goes on to define in the words above quoted. This degree of care is substantially that obtaining in cases against carriers, as laid down by our courts. *Hall* v. *Connecticut River Steamboat Co.*, 13 Conn. 319; *Derwort* v. *Loomer*, 21 Conn. 245; *Fuller* v. *Naugatuck R. Co.*, 21 Conn. 557; *Murray* v. *Lehigh Valley R. Co.*, 66 Conn. 512, 34 Atl. 506; *Thorson* v. *Groton & Stonington Street Ry. Co.*, 85 Conn. 11, 81 Atl. 1024; *Ferguson* v. *Connecticut Co.*, 87 Conn. 652, 89 Atl. 267; *Anthony* v. *Connecticut Co.*, 88 Conn. 700, 703, 92 Atl. 672. Indeed, the charge of the court follows the wording of the charge considered in the case last cited, with only the slight verbal changes necessary to adapt it to the instant case. This measure of duty and degree of care is not that which has been

defined by this court as imposed on proprietors and managers of amusement devices.

We have recently defined the duty resting on proprietors of amusement resorts as follows: "The only duty which rested upon any of the defendants was to use reasonable care to make and keep these premises and the amusement apparatus thereon reasonably safe for the visitors who were invited to enter and use them." *Godfrey* v. *Connecticut Co.*, 98 Conn. 63, 68, 118 Atl. 446. To the same effect are the cases of *Bernier* v. *Woodstock Agricultural Soc.*, 88 Conn. 558, 92 Atl. 160; *Glynn* v. *Lyceum Theatre Co.*, 87 Conn. 237, 241, 87 Atl. 796. The proper standard, then, to be applied to the present defendant's conduct in this case, is that of the ordinary care of a reasonably prudent man under the circumstances. If he uses a measure of care and diligence proportioned to the occasion, its possibilities and its dangers, he has fulfilled his legal duty. *Dickerson* v. *Connecticut Co.*, 98 Conn. 87, 118 Atl. 518. The trial court erred in its charge as to the character of care required.

It may be said that there is ample justification for the ruling made, in the fact that the revolving cars or boats are quite similar to the moving trains upon a railroad in the motive power employed and in the considerable hazard of operation of each. But the rule applied is not governed by such considerations, but rather founded upon the occasion of use of the respective instrumentalities. One traveling upon his lawful occasions must perforce use the ordinary means of transportation, and is practically compelled to place himself in the care of carriers of passengers, and so the rule applied to carriers holds them to the highest degree of care and diligence. On the other hand, one desiring for his delectation to make use of pleasure-giving devices similar to the one in question is under

no impulsion of business or personal necessity. He is seeking entertainment, and when invited by a manager to avail himself of the equipment provided by certain forms of amusement, he can properly ask only that he be not exposed by the carelessness of those in charge of any given instrumentality to harm preventable by care appropriate to the operation of such instrumentality. It would have been entirely proper and feasible for the trial court in elucidating the standard of ordinary care to the jury, by proper comment upon the evidence, to have suggested that the operating hazard of an aeroplane swing was considerable, and that ordinary care required more, and more exact, supervision in its use, than obtains in the case where there is little or no element of danger involved in any given device.

As a corollary to the claim we have been considering, the defendant makes the point that the claim that the same rule of care was properly applicable to the present case as obtains in the case of carriers, did not emerge from the case until it appeared in the charge of the trial judge, and that the plaintiff pleaded that the defendant owed only the duty of ordinary care and not that higher form of care devolving on carriers of passengers, and the allegations of the complaint did not fairly apprise the defendant that such a claim was being made against it, and so that facts proven but not averred were made a basis for recovery against it, citing *Stein* v. *Coleman*, 73 Conn. 524, 529, 48 Atl. 206, and *Whiting* v. *Koepke*, 71 Conn. 77, 40 Atl. 1053. The eighth paragraph of the complaint avers in this regard "that said injuries were caused by the negligence of the defendant, its servants, agents and employees, in that they negligently constructed, maintained and operated the aforementioned 'aeroplane swing,' or by the exercise of ordinary care could have known that said swing was dangerous to said plaintiff."

The matter just quoted refers to the construction, maintenance and operation of the aeroplane swing fully described in the earlier part of the complaint, and set forth at length at the beginning of the preceding statement of facts. The complaint was adequate to charge, and apparently intended to charge, only that the swing was negligently maintained and operated. Had the character or mode of operation been such as to legally involve, as the trial court held it did involve, the application of the strict requirement of care imposed on carriers, it would have been sufficient to state the facts compelling such an application without adding thereto any claim of law directly asserting the rule of care, which should apply as matter of law. The rule involved is sufficiently plead and invoked, when it follows from the facts plead, and will in a proper case be applied without special characterization. The error in the charge consisted in application of a wrong rule, and not of one insufficiently plead.

The defendant's second point is that where the defendant bought a standard machine it might, as a matter of law, expect that proper care had been exercised in its construction, and be liable only so far as it failed thereafter in applying proper tests of its own to the apparatus; and furthermore that it is not liable for latent defects undiscoverable by the proper degree of care.

Upon the effect of a latent defect, the court charged that if the jury found that there was a latent defect the fact would be important to have in "mind in determining whether or not proper care was used in inspecting and testing this machine; but the fact that it was a latent defect, in itself, is nothing. The question is, did the defendant use a proper degree of care to inspect and test this, and would the exercise of that proper degree of care have disclosed the defect? If it would

have disclosed the defect, it is of no consequence whether that defect be latent or apparent. If it would not have disclosed it, then, in so far as any question of the testing or inspection of the machine is concerned, you would not be able to fasten liability upon this defendant. The question of whether or not the defect was latent is of no consequence except as it may reflect upon the question whether or not, in the inspection and testing of this machine, the proper degree of care was used." Criticising this utterance of the trial court, defendant says: "The court has obviously left it to the jury to say whether or not a proper degree of care was used to discover a latent defect." On the contrary, the court has said something very different, that is, did the defendant properly inspect and test the machine, and if a proper test "would have disclosed the defect, it is of no consequence whether that defect be latent or apparent"; and further, that if a proper degree of care in the way of tests used would not have disclosed the defect, then the defendant would not be liable. The charge above quoted would appear to be eminently fair to the defendant, and not open to the objections made thereto by the defendant.

In a third point defendant claims that the court erred in charging with regard to the construction of the machine, in connection with the fact that it was of standard construction. On this point the court said: "Again, there has been testimony here in regard to similar constructions used in other amusement parks, testimony to the general effect that this swing was constructed, and operated, I think, just as other similar swings were constructed, and possibly operated, in other amusement parks. Now that fact, if you find it to be a fact, would not be a defense to this defendant." Ceasing to quote at this point, defendant says that the statement is erroneous. What the court meant

to say here is clearly that the fact stated would not of itself be a complete defense to the action, which is correct. For the court immediately continued: "But that fact, if you find it to be a fact, would be something which you should properly have in mind in determining whether or not the defendant used a proper degree of care, that degree of care which I have defined to you, . . . and so, in determining whether that standard was lived up to, what other men did in like situations, with like instrumentalities, elsewhere, is a relevant consideration." Defendant here was given the full benefit of testimony introduced by it as to use of the machine by others, and the inference therefrom that it had exhibited due care in buying a safe, standard piece of apparatus.

It is also claimed that by its action just considered, "the court submitted the issue of proper construction of a highly technical engineering device to a jury of laymen," and therein erred in point of law. The court did nothing of the kind; it merely gave the defendant the benefit of testimony showing that it was not negligent as regards the construction of the machine, in that it purchased one of standard make.

In this connection the defendant claims that the charge of the court with reference to its evidence regarding the factor of safety was erroneous. As to this the charge was as follows: "Then, there has been a good deal of testimony here in regard to the so-called factor of safety, or margin of safety. That testimony, of course, was necessarily based upon materials which were not defective. It would be a consideration, and an important consideration, for you to consider in determining whether or not, in the initial instance, this swing was properly constructed, so constructed with that degree of care which it was incumbent upon this defendant to exercise; but, because it does not

take into consideration materials that are defective, when it comes to the question of the exercise of proper care by this defendant, with reference to the inspection of the swing, then the factor of safety and the margin of safety becomes an irrelevant consideration, and you have to ask, aside from it, did the defendant exercise a proper degree of care with reference to the inspection and testing and the general care and oversight of this swing within the allegations of the complaint." In the earlier part of the paragraph just quoted, the court emphasizes the importance of this testimony as bearing upon the proper construction of the machine, and upon the care to be exercised in such construction; in other words, as tending to justify defendant in its installation and operation. But the court adds, in effect, that this testimony when related to the question of care in inspection is irrelevant. The duty properly and frequently to inspect the machine arises from its maintenance and operation, and is in no way conditioned by the fact that it was constructed with a large margin of safety. The claim of defendant is that the court, in effect, instructed the jury to find negligence in construction. On the contrary, the court said this testimony was an important consideration upon the question of construction, and hence in so far as the jury might give it weight a favorable consideration.

The court, in instructing the jury as to its application of facts found, to the allegations of the complaint, said: "It is only as there was a failure to exercise the degree of care I have defined to you, within the fair purview of the allegations of the complaint I have just spoken of, that the plaintiff would be entitled to recover. So your question is, was there, in some one or more of the ways fairly included within the specifications of negligence I have just spoken of as being

within the complaint, a failure on the part of the defendant to exercise that degree of care which I have stated to you it was incumbent upon it to exercise." The defendant in its fourth point contends that by the use of the language just quoted, the court left to the jury the construction of the complaint, when the jury was asked to treat the question of degree of care within the fair purview of the allegations of the complaint, which is erroneous, as the construction of the complaint was purely a question of law for the court. It contends that the purview of the complaint is made to be its scope as resolved by the jury. But this purview of the complaint had, in the earlier part of its charge, been sufficiently explained by the court, and the essentials necessary to make out a case pointed out. This contention has no merit.

Having held that the charge of the court was erroneous upon the first of defendant's points, and hence that there must be a new trial, we have felt justified in treating the points which follow somewhat briefly. Defendant's fifth point relates to the application of the rule of *res ipsa loquitur*, and in considering it we shall have to proceed in a still more summary way, as compared with the extended and monographic treatment of the subject in defendant's brief. It is contended (a) that the rule was not applicable to the facts developed in the instant case; (b) that the allegation of specific negligence excluded its operation; (c) and that even if applicable, the charge to the jury was inadequate, incorrect and erroneous. The general conditions justifying the application are well understood, and are clearly explained in the opinion of this court in *Stebel* v. *Connecticut Co.*, 90 Conn. 24, 96 Atl. 171. In the following discussion we are concerned only with the first prerequisite there laid down as follows: "(1) that the apparatus must be such that in the ordinary

instance no injurious operation is to be expected unless from a careless construction, inspection, or user." The defendant claims that a latent defect undiscoverable by an inspection conducted with due care, presents an instance where the incident would have happened in the absence of careless construction, inspection or user. Defendant insists that there was no defect in construction, no negligence in that regard in view of the testimony; yet there was conflicting evidence upon the point, and the question was one for the jury. Such a defect cannot be assumed as nonexistent. Also it insists that there was no carelessness in inspection, but that was the pivotal point in the case, earnestly contested; it is peculiarly one for the consideration of the jury, and was evidently passed on adversely to the defendant. As we have before stated, the motion to set aside the verdict has not been pressed in this court, and we cannot consider the propriety of the verdict of the jury upon these issues. We are only concerned with the charge, and claimed proof of the parties.

The next claim of defendant upon the topic now considered, is that the plaintiff has lost the benefit of this rule by pleading a specific act of negligence, and must stand or fall upon this allegation. The allegations in the complaint particularly relied upon as supporting this contention are those of the breaking of the rod, in consequence of which the car fell and the plaintiff was injured, and also that defendant "by the exercise of ordinary care could have known that the swing was dangerous"; this latter specification is, of course, merely another way or saying that there was insufficient inspection. The rule of pleading relied on by the defendant is not universally recognized. While there is confusion among the cases upon the point, the weight of authority seems to be otherwise, and to hold "that, if

the case is a proper one for the application of the doctrine, the plaintiff by pleading the particular cause of the accident in no way loses his right to rely thereon." 20 R. C. L. 187, citing *Cassady* v. *Old Colony St. Ry. Co.*, 184 Mass. 156, 68 N. E. 10, and other cases.

We have no occasion to definitely pass upon this claim as one of law, however, for the existence of the defect in the metal composing the rod which broke was not plead, it came out in the evidence. Want of allegation of this fact could not have misled the defendant; presumably at the time of bringing suit plaintiff may not have had knowledge of this defect, certainly the knowledge of the defendant was full and exact. The allegation of the complaint (par. 6) is, that "suddenly and without warning a part of the construction of the 'aeroplane swing' or boat in which plaintiff was riding broke," while in paragraph 8 there is a general allegation that plaintiff's injuries were caused "by the negligence of the defendant, its servants, agents and employees, in that they negligently constructed, maintained and operated the aforementioned 'aeroplane swing,' or by the exercise of ordinary care could have known that said swing was dangerous to said plaintiff." This is simply a general allegation of negligence. As far as the evidence was concerned, what happened is well described at the opening of defendant's brief, where it is said: "The plaintiff proved her carriage upon the swing, proved the sudden break in the cable, and claimed to prove her injury, and rested." The pleadings and this statement of the state of the evidence, seem to present a typical case of reliance on the rule of *res ipsa loquitur*, and nothing else.

Plaintiff is relying for recovery upon an occurrence which caused her harm. If she properly recovered in the action, she did so not because there was a latent

defect in the iron rod, but because back of that defect there was a causal relation of negligence on the part of defendant. In bringing her cause of action to the court she merely made a general allegation of negligence. She could not have done less and had a complaint legally sufficient: she did not attempt to do any more.

In (c), defendant urges the claim that the doctrine now considered was improperly applied by the court in its charge to the jury. The part of the charge objected to by the defendant as dealing unfairly with this rule is as follows: "I have said to you that the mere fact that this supporting arm broke is not enough to establish a liability as against this defendant. However, the mere fact that an arm broke, in view of the circumstances which have been detailed to you as to the surroundings of that fact, is an important consideration for you to have in mind as reflecting and bearing upon the issue of whether or not proper care was used with reference to the inspection and the testing of this particular swing. The fact that it broke, while it does not fasten liability upon the defendant, however, is a fact in the case which is to be held in mind by you in considering the circumstances of the case and in applying the test which I have defined to you." By the use of these words defendant claims that the court erred in leaving this important doctrine with the jury, "its purpose unexplained, its limits undefined, its use unindicated." The serious mistake of defendant's counsel occurs right here. The trial judge did not leave any doctrine with the jury. Not from anything which he told them, could the jurors have known that there was any such doctrine. The court instructed the jury to bear in mind some evidence which was in the case to be considered, but which did not of itself fasten liability upon the defendant. Counsel complain that with this instruction the court furnished the jury with "a 'touch-

stone' to try defendant's explanation, the burden of
which had been imposed upon the defendant by allow-
ing the plaintiff the benefit of the doctrine." Now
the only burden which had been imposed by the court
on the jury was to let the case pass the court. A non-
suit had thereby been obviated. Did we not know from
a colloquy between court and counsel printed in the
evidence, that the trial judge considered that when
the court allowed the case to go to the jury everything
in the way of a presumption had dropped out, we could
clearly infer this fact from the way in which he treated
the case. As far as the jury were concerned, the plain-
tiff had no benefit from any presumption, consequently
there was no occasion for the court to refer to or ex-
plain it. So far as the language of the court affected
the force of the evidence referred to, it limited rather
than gave it any undue weight or improper application.
The jury were instructed that the plaintiff had the
whole burden of proof on all the evidence, to which
fact the defendant's counsel adverts but says that it
was ineffectual and inadequate unless made in close
connection with the doctrine now under discussion,
and as explanatory thereof. We see no reason why
this doctrine should have been brought to the attention
of the jury merely to be later limited and explained.
There is nothing erroneous in the action of the court
regarding the matters covered by the fifth point.

Counsel for defendant seem to have entirely mis-
apprehended the purport and meaning of the extract
from the charge of the court complained of in their
sixth point, and that it deceived the jury in any way,
or caused speculation or conjecture is far from apparent
from the six pages devoted to laboring the point.

Point seven, claiming error in the court's presenta-
tion of the question of damages, is without merit. In
sustaining the trial court's charge upon all questions

except that contained in the defendant's first point, we have assumed that they were accompanied by a proper and correct statement of the standard of care. In most instances this was not the case, and the reference to the incorrect standard adopted by the court are frequent. To this extent they are invalidated, but freed from all connection with this erroneous standard, they would be correct statements of law.

There is error and a new trial is ordered.

In this opinion the other judges concurred.