LA SOCIEDAD DE GANANCIALES compuesta por HÉCTOR HUYKE COLÓN y su esposa, ALICE MIRIAM SOUFFRONT, demandante y recurrido, *v.* PRESBYTERIAN HOSPITAL OF THE CITY OF SAN JUAN, INSURANCE COMPANY OF NORTH AMERICA ET AL., demandados y recurrentes los dos primeros.

*Número:* 277      *Resuelto:* 16 de mayo de 1963

*Juan Enrique Géigel, Guillermo Silva, Jaime A. García Blanco, Hernán G. Pesquera* y *Vicente Santori Coll,* abogados de los recurrentes; *Carlos N. Souffront,* abogado de la recurrida.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Se trata de una reclamación contra un hospital donde fue operada la demandante. La aplicación de la doctrina de *res ipsa loquitur* y la razonabilidad de las sumas concedidas están envueltas. Veamos los hechos.

Como resultado del examen médico que fuera realizado por el Dr. Roberto Jiménez López a Alice Miriam Souffront, éste determinó que estaba padeciendo de un nódulo o tumor en la tiroide de carácter peligroso debido a la probabilidad de que el mismo fuera un tumor maligno. Esa circunstancia le fue informada a la Sra. Souffront así como también la necesidad de que se sometiera a una intervención quirúrgica con el fin de extirpar el tumor. A ese efecto fue recluida el día 19 de marzo de 1958 en el Hospital Presbiteriano, por instrucciones del referido doctor, quien para esa fecha ocupaba el cargo de Director Médico de ese hospital. La operación habría de ser realizada el día siguiente y el Dr. Jiménez actuaría en calidad de médico privado.

Para esa fecha la firma de ingenieros constructores Rodríguez del Valle Inc. se encontraba, mediante contrato con el hospital, realizando obras de reparación del edificio en el piso superior al de las salas de operaciones.

Durante la tarde del día de su ingreso al hospital la Sra. Souffront fue sometida a las drogas y medicamentos de rigor para prepararla para la operación. A la mañana del día

siguiente fue llevada a la Sala de Operaciones donde se le aplicó anestesia general que requirió la introducción de un tubo endotraqueal para continuar la anestesia a través del tubo endotraqueal directamente a los pulmones, además de inyecciones de curare y pentotal sódico. Cuando ya estaba completamente anestesiada y el Dr. Jiménez se proponía a comenzar la operación, el anestesiólogo le informó que en una sala de operaciones contigua estaba cayendo un polvillo que se observaba acumulado en doce o veinte granillos sobre la sangre que contenía un frasco que le mostró. El Dr. Jiménez López procedió entonces a sacudir la toalla que cubría sus instrumentos y vio que la misma despedía también cierto polvillo. Como no sabía si era estéril el polvillo que despedía la toalla y cabía la posibilidad de que no lo fuera si provenía de las obras que se llevaban a cabo en el edificio del hospital, consideró un riesgo para la paciente practicar en ese momento la operación y la suspendió. Ambas partes están contestes en que el cirujano optó por lo más aconsejable dentro de las circunstancias al así decidirlo. Posteriormente fueron suspendidas también las obras de construcción.

Como consecuencia de la anestesia intratraqueal desarrolló la Sra. Soufffront una cianosis e hipotensión con fiebre alta, escalofríos y vómitos. La cianosis le pasó como a las dos horas, pero la fiebre alta le duró hasta el día siguiente. Estos síntomas se debieron a la anestesia y a la manipulación de la tráquea y la garganta para administrársela que aparentemente le lastimó alguna región que seguía inflamada por razón del catarro que estaba padeciendo la paciente.

Cuando tuvo conocimiento que la operación había sido suspendida creyó que no se la habían practicado porque le habían encontrado algo maligno. Esta circunstancia le produjo una gran nerviosidad y preocupación. No obstante haber sido informada por el Dr. Jiménez López, al día siguiente, los motivos por los cuales hubo que suspender la operación, siempre conservó la preocupación de tener que experimentar

nuevamente lo que ya había sufrido. Incluso se sintió preocupada por el bienestar y cuidado de sus hijos a quienes habría de dejar otra vez al cuidado del servicio.

El día 22 de marzo de 1958 fue dada de alta y reingresó al hospital el día 28, cuando fue operada felizmente por el Dr. Jiménez López.

Comenzada la vista en sus méritos los codemandados Rodríguez y Del Valle, Inc., fueron eliminados del pleito por haber convenido el Hospital Presbiteriano que si alguna negligencia había en relación con las obras de construcción y ya que dichas obras se venían realizando sujetas a un plan trazado por el hospital, la responsabilidad sería del hospital y no de los contratistas.

También fue eliminado el Dr. Jiménez López por entender las partes que dicho doctor tomó el único curso de acción aconsejable en estas circunstancias, o sea, la suspensión de la operación para proteger a la paciente.

Es decir, que los demandantes desistieron de su demanda en cuanto a todos los demandados excepto el Hospital Presbiteriano y su aseguradora, la codemandada Insurance Company of North America.

El Tribunal Superior aplicó la doctrina de *res ipsa loquitur* para imponerle responsabilidad al Hospital Presbiteriano. Llegó el tribunal sentenciador a las siguientes conclusiones de derecho:

1. La alegación de actos específicos de negligencia no impide la aplicación de la doctrina de *res ipsa loquitur*. *Román* v. *Mueblería Central*, 72 D.P.R. 341, 343, 345 (1951); *Rodríguez* v. *White Star Bus Line*, 54 D.P.R. 310, 312, 313 (1939).

2. Que dicha doctrina se funda en un criterio de probabilidades. Sus dos requisitos esenciales son que los hechos y circunstancias del caso señalan con más probabilidad que con menos (1) que alguien incurrió en negligencia, y (2) que de ella responde la parte demandada. *Kirchberger* v. *Gover*, 76 D.P.R. 907, 912, 913 (1954); *Cintrón* v. *A. Roig Sucrs.*, 74

D.P.R. 1028, 1036, 1037 (1953); *Zentz* v. *Coca Cola Bottling Co. of Fresno*, 247 P.2d 344, 346–350 (Cal. 1952).

3. Que es muy improbable que en una sala de operaciones se acumule polvillo como el encontrado en el frasco de sangre sin que se deba a la negligencia de alguien.

4. Que la presencia del polvillo en la sala de operaciones —débase o no a una de las dos posibles causas que surgen de la prueba—fue ocasionada por la negligencia de algún empleado o agente de la demandada. De la prueba no aparece la relación específica que existía entre la demandada y el médico y las personas que con él trabajaban en la sala, pero véase *Ybarra* v. *Spangard*, 154 P.2d 687, 691 (Cal. 1945).

5. No habiendo demostrado la demandada que no fue por la negligencia de algún empleado o agente suyo que apareció el polvillo, contra ella debe prevalecer la inferencia que conlleva la doctrina de *res ipsa loquitur*.

El tribunal en su sentencia concedió a los demandantes Héctor Huyke Colón y Alice Miriam Souffront la suma de $5,800.00 por concepto de daños y perjuicios más $400.00 de honorarios de abogado.

Los recurrentes imputan la comisión de los siguientes errores:

"PRIMERO: Al dictar sentencia favorable a la parte demandante, y sin prueba alguna en la que predicarla, recurrir a la llamada doctrina de Res Ipsa Loquitur—inaplicable a los hechos y circunstancias de este caso—para imponer responsabilidad a esta recurrente, Presbyterian Hospital of the City of San Juan, a base de remotas posibilidades y meras especulaciones y conjeturas.

"SEGUNDO: Al conceder a los demandantes una compensación ascendente a $5,800, suma ésta que resulta exagerada y desproporcionada a la naturaleza e insustancialidad de los supuestos daños sufridos por la parte actora."

Ha señalado nuestra jurisprudencia que son tres las condiciones que se requieren para que tenga aplicación la doctrina de *res ipsa loquitur*: (1) el accidente debe de ordina-

rio no ocurrir a no ser por la negligencia de otra persona; (2) debe causarlo una agencia o instrumentalidad dentro del control exclusivo del demandado; (3) no debe ocurrir debido a acción voluntaria alguna del demandante. *Hermida* v. *Feliciano*, 62 D.P.R. 55, 57, 58 (1943); *Cintrón* v. *A. Roig Sucrs.*, 74 D.P.R. 1028, 1036 (1953); Prosser *On Torts*, 2da. ed., pág. 201 (1955); Wigmore, *Evidence*, 2d ed., sec. 2509, pág. 498; Harper & James, *The Law of Torts*, Vol. 2, pág. 1081 (1956), señalan un cuarto requisito, a saber: que el conocimiento de las causas del daño sufrido deban estar más accesible al demandado que al demandante. En *McDonnell* v. *Montgomery Ward & Company*, 154 A.2d 469, 473 (Vt. 1959), se indica que debe existir como condición previa a la aplicación de la doctrina el deber legal del demandado hacia el demandante de ejercer cierto grado de cuidado en conexión con la instrumentalidad en particular para prevenir la ocurrencia del daño; 65 C.J.S., sec. 220 (7), pág. 1004.

■ El tribunal de instancia determinó que por ser muy improbable que en una sala de operaciones se acumule polvillo como el encontrado en el frasco de sangre sin que se deba a la negligencia de alguien se entiende cumplido el primero de los requisitos. Entendemos que actuó acertadamente el tribunal al hacer tal determinación. Un hospital público o privado tiene el deber de ofrecer a sus pacientes el cuidado y la atención razonable que requieran las circunstancias. El paciente es generalmente admitido en un hospital bajo la obligación implícita de que habrá de recibir aquel cuidado y atención razonable para su seguridad según lo requiera su condición física y mental. *Wetzel* v. *Omaha Maternity & General Hospital Ass'n.*, 96 Neb. 636, 148 N.W. 582 (1914); *Skidmore* v. *Oklahoma Hospital*, 278 Pac. 335 (1929); *Gardner* v. *Newman Hospital*, 198 S.E. 122 (Ga. 1938). "Resultan decisivas en cada caso las condiciones y conducta específicas del paciente, su capacidad para cuidar de sí mismo, la información que realmente tenga el hospital sobre esas condiciones y esa

conducta y capacidad y la que debe obtener si usa debidamente de la habilidad y experiencia de sus profesionales para constatarlas, y los peligros que existan en los alrededores." *Hernández* v. *La Capital*, 81 D.P.R. 1031, 1038, (Serrano Geyls) (1960).

En *Tulsa Hospital Ass'n* v. *Juby*, 175 Pac. 519, 523 (1918), la paciente desarrolló una pulmonía como resultado de la humedad por razón de las lluvias que penetraron a través del techo cayendo directamente a la cama de la demandante. Se expresó el tribunal del modo siguiente:

"Incumbía al demandado ejercer el cuidado ordinario de proporcionar al demandante un sitio seguro y apropiado y emplear el cuidado ordinario de velar por la protección de la demandante mientras ella se encontraba bajo su cuidado y custodia."

El grado de cuidado que se requiere al hospital es aquel que ejercería un hombre razonable y prudente en condiciones y circunstancias similares. 41 C.J.S., pág. 350; *Rice* v. *Cal. Lutheran Hospital*, 163 P.2d 860, 862, 864 (Cal. 1945); *Lexington Hospital* v. *White*, 245 S.W.2d 927, 929 (Ky. 1952); *Fetzer* v. *Aberden Clinic*, 204 N.W. 364 (1925); *Gray* v. *Carter*, 224 P.2d 28 (1950); *Hogan* v. *Clarksburg Hospital Co.*, 63 W. Va. 84, 59 S.E. 943 (1907), 124 A.L.R. 189; *Hernández* v. *La Capital*, supra. No obstante, un hospital no es un asegurador contra todo daño imaginable sino de aquellos que lleven a un hombre razonable y prudente a anticiparlos. *Rice* v. *Lutheran Hospital*, supra; Harbison, *The Standard of Care Owed by a Hospital to its Patients*, 2 Vand. L. Rev. 660 (1949).

Ciertamente después de haber la Sra. Souffront pagado el precio de admisión y luego de ser admitida como paciente del Hospital Presbiteriano tenía derecho a presumir que le sería dada la protección razonable a su salud y seguridad personal y que se le habría de proveer las medidas de seguridad apropiadas para el fin de su admisión al hospital. Así, tenía derecho a presumir que la operación que habría

de experimentar se llevaría a cabo de manera normal y corriente, tal y como se ejecutan operaciones de esa naturaleza en los demás hospitales. Por tanto, cuando un polvillo no identificado en un frasco de sangre de la sala contigua así como en las toallas y sábanas y en todo el interior de la sala en que habría de ser intervenida ella quirúrgicamente es el motivo de la suspensión de la operación, tal ocurrencia da lugar a una inferencia de que tal suceso no hubiera ocurrido a no ser por la negligencia de alguna persona.

En la determinación de si el accidente es de tal naturaleza como para inferir que probablemente fue el resultado de la negligencia de alguien, las cortes han descansado en dos consideraciones: (a) conocimiento general; (b) testimonio de expertos, así como de las circunstancias que rodearon el accidente en cada caso en particular. *Wolfsmith* v. *Marsh*, 337 P.2d 70, 72 (Cal. 1959). Ver además otros casos citados en dicha opinión; *Zentz* v. *Coca Cola Bottling*, 39 Cal.2d 436, 446, 247 P.2d 344 (1952); *Baver* v. *Otis*, 133 Cal. App. 2d 443, 284, P.2d 133, 136 (Cal. 1955). Es de conocimiento general que en el curso usual y ordinario de las cosas no ocurre un accidente de la naturaleza del aquí ocurrido si se ha ejercido el grado de cuidado razonable de parte de las personas llamadas a velar por la protección de un paciente bajo su custodia. De esta manera lo indica este Tribunal en *Hermida* v. *Feliciano*, supra, pág. 58, citando a Prosser:

". . . hay sucesos en que por sí mismos demuestran negligencia . . . Cuando un puesto de gasolina estalla misteriosamente, surgen muchas explicaciones posibles pero la más probable es que hubo negligencia de parte de los que estaban a su cargo. Todo lo que se exige es que hombres razonables puedan afirmar que, consideradas todas las circunstancias, es más probable que hubo negligencia envuelta en la causa que afirmar que no hubo."

Para casos en que se ha entendido cumplido este primer requisito de la doctrina, acúdase a Harper & James, Vol. 2, pág. 1082. Se ha señalado que "el requisito no es otra cosa

que otra manera de declarar un principio de evidencia circunstancial, de que el accidente debe ser tal que a la luz de la experiencia ordinaria dé lugar a la inferencia de que alguien ha sido negligente. Donde no haya base de conocimiento general para tal conclusión, el testimonio de expertos puede ser suficiente base para la misma." Prosser, 2d ed., pág. 202 (1955).

De American Jurisprudence, 38 Am. Jur., sec. 296, pág. 992, copiamos lo que sigue:

"La regla del Res Ipsa Loquitur surge de la inherente naturaleza y carácter del acto causante del daño y de la razonable probabilidad a ser inferida del carácter del accidente mismo. Tiene su fundamento en el conocimiento común y la experiencia general basada ésta en las circunstancias genéricas peculiares a la clase de causas físicas que produjeron el accidente en cuestión.

"La presunción surge de la doctrina de la probabilidad. Se pesa y se mide el futuro con el pasado y se crean presunciones a base de las experiencias pasadas. *Lo sucedido en el pasado bajo las mismas condiciones, probablemente ocurrirá en el futuro, y se presumirán los resultados ordinarios y probables hasta que no se demuestre lo contrario.* Se usa la frase para expresar la idea de que cuando se demuestra que un accidente es de tal naturaleza, que a la luz de la experiencia común y ordinaria es inexplicable excepto como resultado de negligencia, entonces se presume o se infiere la negligencia. La doctrina no descansa sobre datos establecidos. No se aplica cuando existe prueba directa en cuanto a la causa precisa de la lesión y surgen todos los hechos y circunstancias que rodean el suceso." (Énfasis suplido.)

Considerando las circunstancias presentes que dieron lugar a la suspensión de la operación, el deber de protección del hospital para con la paciente, la condición en que ésta se encontraba al ocurrir el accidente y el conocimiento general en cuanto al curso normal de las operaciones que se realizan en la salas de los hospitales, nos vemos obligados a concluir que es correcta una inferencia al efecto de que el mismo no hubiese ocurrido si las personas llamadas a ejercer el debido cuidado lo hubiesen así ejercido. Indudablemente que

es más probable pensar que hubo negligencia dentro de un criterio de razonabilidad que afirmar que no la hubo.

Como ya hemos apuntado sobre el hospital es que recae la obligación de velar por el buen cuidado de sus pacientes mientras se encuentran allí recluidos. Sin embargo, para la aplicación de la doctrina de *res ipsa loquitur* como base de responsabilidad, se hace necesario el que la agencia o instrumentalidad que ocasionó el accidente haya estado en ese momento bajo el control exclusivo del mismo. La razón por la que se exige el requisito de control exclusivo es que la negligencia que surge de la manera como ocurrió el accidente es probablemente aquélla del demandado y de nadie más. Harper & James—*The Law of Torts*, Vol. 2, pág. 1085. Es decir, se trata de eliminar la posibilidad de que el accidente fuera causado por un tercero.

De un examen de la evidencia que surge del récord taquigráfico se desprende a todas luces que se ha cumplido con el requisito de "control exclusivo." Esto encuentra apoyo en las siguientes declaraciones del Sr. Arturo Plard, Administrador del Hospital Presbiteriano:

"P. ¿Y quién era responsable de que, quién es responsable por el mantenimiento y la asepsia de la sala de operaciones, el doctor Jiménez, el Hospital, quién?

R. La asepsia de la sala nosotros tenemos una supervisora

. . . . . . . .

P. Esa es empleada del Hospital?

R. Sí, la señorita Balasquide, supervisa *toda* la sala de operaciones.

P. ¿Y esa es la persona a quien usted como administrador ha encargado de que la sala se mantenga en condiciones para efectuar las operaciones? ·

R. Sí, señor.

. . . . . . . .

HON. JUEZ:

P. De acuerdo con su declaración, el Hospital es el responsable de la asepsia de la sala, el Hospital a través de su empleada, de la supervisora. O sea, no hay ni médico ni

persona extraña al Hospital que sea responsable de la asepsia del Hospital.

R. Un médico, yo no puedo responsabilizar a ningún médico que venga de fuera que sea responsable de la asepsia.

P. Los contratistas no eran, Rodríguez y del Valle, no eran responsables de la asepsia de la sala?

R. Dentro de la sala no señor, ellos no entraban dentro de la sala."

De lo declarado por la señorita Balasquide se puede ver aun más claramente el control que sobre las salas de operaciones, a través de sus empleados, mantenía el hospital. En parte es como sigue:

"P. Señorita, como supervisora de la sala de operaciones, ¿cuáles son los deberes y obligaciones suyos?

R. Bueno, en primer lugar, tenemos los récords de la sala; velar por la asepsia, *que esté todo completo* y que la técnica se lleve a cabo." (Énfasis suplido.)

En vista de que era el hospital quien ejercía el control exclusivo sobre las salas de operaciones, es imperativo que concluyamos que se dio cumplimiento al segundo de los requisitos para la aplicación de la doctrina de *res ipsa loquitur*. En American Law Reports (24 A.L.R.2d 647, sec. 4), se dice lo siguiente:

". . . uno de los factores esenciales que se requiere sea demostrado antes de aplicar el principio de Res Ipsa Loquitur a una situación que envuelva la caída de un objeto o sustancia del techo de un establecimiento público es que la parte contra quien se trata de imponer responsabilidad tenía el control de la agencia que causó el daño. Al aplicar la doctrina la mayoría de los tribunales, analizando esta cuestión han indicado, ya expresamente o por implicación, *que el control del local en cuestión es equivalente al control de la agencia causante del daño.*" (Énfasis suplido.)

Creemos que el mismo principio tiene aplicación a nuestro caso. Por lo tanto, habiendo sido la presencia del polvillo —inexplicada en cuanto a su causa—la única razón que tuvo el médico para suspender la operación, hay que decir que el

accidente de ordinario no ocurre a no ser por la negligencia del hospital quien tiene a su cargo el control y supervisión del lugar.

El tercero de los requisitos para la aplicación de la doctrina no merece discusión, ya que el mismo fue cumplido. No hay nada en la prueba que demuestre acción voluntaria alguna de la demandante que haya dado lugar a la ocurrencia del daño.

Sostienen los apelantes que habiéndose establecido que era más probable (*sic*) que el polvillo fuera talco, en lugar de polvo procedente de la obra, no tenía aplicación la doctrina de *res ipsa loquitur*. No tienen razón. El tribunal sentenciador entendió que era de aplicación la doctrina toda vez que no hubo explicación de ninguna de las partes de la presencia del polvillo en las salas. Consideró irrelevante el tribunal la controversia de si el polvo procedía de las obras o del talco que el cirujano y sus asistentes usan para ponerse sus guantes en la sala de operaciones. En *Kirchberger* v. *Gover*, 76 D.P.R. 907, 913 (Ortiz) (1954), dijimos que no era aplicable la doctrina y no surgía inferencia alguna de negligencia si de los hechos resultaba que había alguna otra causa probable del accidente de la cual podía inferirse que no hubo negligencia y si la prueba era compatible con la probabilidad de ausencia de negligencia.Como se puede abservar, el citado principio contempla el que contra la inferencia de negligencia—probable causa del accidente—debe aparecer otra causa que por ser *probable* pueda inferirse que no hubo negligencia. No sería suficiente prueba la *posibilidad* de ocurrencia de un hecho para que se entienda controvertida la inferencia que por la ocurrencia de ciertos hechos en determinadas circunstancias nos ofrece la doctrina de *res ipsa loquitur*. El tribunal, en cambio, haciendo uso de su facultad en la apreciación de la prueba entendió que la evidencia ofrecida no dejó explicada la presencia del polvillo en las salas como para que se entendiese rebatida la inferencia de negligencia.

El caso de *Kirchberger* v. *Gover*, supra, pág. 913, es completamente distinguible del presente. Allí el automóvil del demandante fue chocado mientras se encontraba estacionado frente a la residencia de éste. De tal estado de hechos el tribunal inferior encontró que se justificaba una inferencia de negligencia contra el demandado a base de la doctrina de *res ipsa loquitur*. Este tribunal, revocando la sentencia apelada llegó a la conclusión que el hecho de que las luces del vehículo del demandante estaban apagadas "es suficiente para establecer una probabilidad al efecto de que la causa exclusiva del accidente no fue la supuesta negligencia del demandado, siendo por lo tanto, inaplicable la doctrina de *res ipsa loquitur*." (La palabra "demandado" usada en la sexta línea de la pág. 913 del Tomo 76 de Decisiones debe ser "demandante".)

En nuestro caso no aparece de la prueba que otra *probable* —aunque sí posible—causa del accidente fuera de otra persona que el demandado. Sobre esa apreciación de la prueba que hiciera el tribunal sentenciador no debemos nosotros pasar. Aun asumiendo la posición contraria insistimos en que el caso de *Kirchberger* continúa distinguible al de autos. Es importante señalar que en aquel caso tal pronunciamiento lo hizo el tribunal en virtud de que no se había probado la relación de agencia entre el demandado y la persona que conducía el vehículo. Era innecesario a los efectos de resolver la cuestión envuelta que se pasara sobre ese extremo. Bastábale al tribunal, como le bastó, considerar que no se estableció adecuadamente que el conductor del vehículo era un agente o empleado del demandado para decir que era inaplicable la doctrina de *res ipsa loquitur*. De la ausencia de tal relación se desprendía la falta del requisito del "control exclusivo." En aquel caso dijimos:

"Considerando especialmente el hecho de que en este caso no se estableció adecuadamente que, al ocurrir el choque, Santos Cruz Ortiz era un empleado o agente del demandado que actuase

de acuerdo con los términos de un contrato de trabajo, no se ha cumplido con el requisito previo del control de la instrumentalidad de parte del demandando, no siendo aplicable la doctrina del 'res ipsa loquitur.' "

Por el contrario, el caso de *Kirchberger* lo que hace es dejar claro que la otra causa *probable* del accidente ha de ser una de la cual pueda inferirse que no hubo negligencia. O sea, que existía la *probabilidad* de que el accidente fuera causado por la negligencia del demandante al dejar estacionado su auto con las luces apagadas.

■ El principio en el sentido de que existiendo otra causa probable de la cual se pueda inferir que no hubo negligencia tiene el efecto de impedir la aplicación de la doctrina, lo vemos admitido en otras decisiones de este tribunal y de la jurisdicción americana: *Cintrón* v. *A. Roig Sucrs.*, supra, 1037 (1953); *The Hygrade No. 18*, 41 F.Supp. 304 (1941); *Martin* v. *Arkansas Power & Light Co.*, 161 S.W.2d 383, 385, 204 Ark. 41 (Ark. 1942).

■ En fin, para que alguna otra causa del accidente haga inaplicable la doctrina de *res ipsa loquitur*, ésta no debe responder a una mera posibilidad de causación, sino que ha de tomar la categoría de causa con probabilidad de efectos. La prueba tendente a demostrar que fue talco inocuo no toma esa categoría y en su lugar pasa a ser una pretensión y nada más. De otro modo, tendríamos que admitir que bastaría la mera introducción de evidencia por el demandado, no importa lo remota e increíble que ésta fuera para concluir que se ha rebatido la inferencia que pesa en su contra.

En los siguientes términos se manifestó *Danville Community Hospital* v. *Thompson*, 43 S.E.2d 882, 889 (Va. 1947):

"No es una objeción válida a la aplicación de la doctrina el que por una posibilidad la quemadura pudiera haber ocurrido en la resucitadora (*resuscitator bassinet*) en la sala de alumbramientos. *Arnold* v. *Wood*, 173 Va. 18, 3 S.E.2d 374. Esa no es la

prueba. No se requiere del demandante que excluya toda posibilidad de que la lesión haya sido causada mediante algún medio del cual no es responsable el demandado. *United Dentists, Inc.* v. *Bryan*, 158 Va. 880, 164 S.E. 556. El criterio es si las circunstancias son aquellas que satisfarían una mente razonable y balanceada respecto a que la negligencia del demandado fue la causa del accidente. El testimonio no tiene que excluir todo aquello que la ingeniosidad del abogado sugiera como posible causa o contribución de la lesión. *Rozumailski* v. *Philadelphia Coca-Cola Bottling Co.*, 296 Pa. 114, 145 A. 700, 701."

Con el testimonio mismo del Dr. Jiménez López se puede justificar el poco crédito que le fue dado por el tribunal a la sugestión de que el polvo talco inocuo fue la probable causa del accidente:

"P. Doctor, no le estoy haciendo esa pregunta. La pregunta que yo le hago es si anteriormente en alguna ocasión anterior a ésta que estamos aquí ventilando, usted vio algo semejante a eso.
R. No.
P. ¿Nunca lo había visto?
R. Nunca.
P. ¿En ningún sitio suspendido, en ninguna clase de líquido? ¿Nunca había ocurrido una cosa semejante?
R. En un contenido no, en un envase con sangre y con polvo encima de la sangre no lo he visto.
P. Digo, y en la cantidad suficiente . . .
R. Para poderse observar.
P. ¿Para poderse observar nunca lo había visto?
R. No, señor.
P. En su experiencia profesional que usted tiene, doctor, de mil novecientos treinta y ocho como cirujano, ¿usted había tenido alguna vez que suspender una operación por esta causa, por miedo a contaminaciones? ¿A contaminaciones al paciente?
R. No recuerdo.
P. Digo, ¿qué dijo?
R. No recuerdo ninguna.
P. Ah, ¿no recuerda que haya tenido?
R. No.

P. O sea, ¿no recuerda que hechos similares a éste ocurrieran nunca con usted?

R. En mi práctica, no señor."

Sería absurdo pensar que la mera posibilidad de que la causa del accidente haya sido el talco inocuo, releve al demandado de su obligación de rebatir la inferencia en su contra. No es ese el espíritu que está detrás de la doctrina de *res ipsa loquitur*. En *Cobb* v. *Marshall Field & Company*, 159 N.E.2d 520, 525 (Ill. 1959), citando a *Bollenback* v. *Bloomenthal*, 173 N.E. 670, 671 (Ill. 1930), se expresó el tribunal:

"La presunción o inferencia de negligencia que levanta la aplicación de esta doctrina [Res Ipsa Loquitur], no es absoluta o concluyente, es controvertible y desaparece enteramente cuando cualquier evidencia se aduce en contrario.

. ". . . . . . .

"Las palabras de Bollenback . . . han sido frecuentemente citadas y han causado muchas dificultades. Si se toman literalmente pueden conducir a resultados absurdos. El caso más fuerte de un demandante podía ser nulificado por la evidencia más débil de un demandado."

El hecho de que el Dr. Jiménez López estuviera actuando en calidad de médico privado, no como director médico del hospital, no puede ser impedimento para que quedara el Hospital Presbiteriano descargado de su obligación de proveer a la paciente las facilidades adecuadas para su protección. No habiendo explicado la ocurrencia del accidente debe prevalecer contra éste la inferencia de que no se ejerció el debido cuidado para proveer tales facilidades. En *Rice* v. *California Lutheran Hospital*, supra, 864, 865, la paciente recibió quemaduras en un brazo con un té caliente que una de las enfermeras del hospital había dejado sobre su cama. El hospital alegó que la enfermera al servir el té estaba siguiendo órdenes del médico de la demandante y por lo tanto él era responsable. La Corte Suprema de California sostuvo a la demandante ya que el deber de cuidado recaía en el hospital y no podía éste escapar de su responsabilidad de proveer el cuidado razonable a la pa-

ciente transmitiéndola al médico. Continuó el tribunal, en apoyo de su razonamiento, citando a *Guilliams* v. *Hollywood Hospital*, 18 C.2d 97, 103, 114 P.2d 15 (1941):

"Las enfermeras que atendieron a la demandante fueron empleadas por el hospital demandado y no eran enfermeras especiales contratadas por el demandante o por su médico. De la misma manera la persona que sirvió el té era empleada de la demandada. La demandada venía obligada a suministrar el debido servicio y cuidado a la demandante y ese cuidado se extendía al suministro de alimentos y a la supervisión del suministro de alimentos. No puede aseverarse que por el hecho del médico ordenar le sirviesen té a la demandante, convirtió a las enfermeras y al que sirvió el té en su sirviente y empleado, excluyendo al hospital demandado como patrono. El hospital aún tenía la dirección y control sobre sus empleados y era responsable del cuidado que éstos debían ejercer en sus menesteres."

El carácter de médico privado, en aquel momento, del Dr. Jiménez López no tuvo el efecto de cambiar el *status* de las enfermeras a cargo de la asepsia de la sala no obstante pudieran encontrarse momentáneamente bajo las órdenes del médico. Siguió el Hospital Presbiteriano por medio de aquéllas, teniendo el control y dirección de las salas. En *Ybarra* v. *Spangard*, 25 C.2d 486, 492, 493, 154 P.2d 687 (Cal. 1944); ordenó el tribunal:

"Todo demandado en cuya custodia ha sido puesto el demandante por cualquier período se obligó a ejercer el cuidado ordinario de ver que ningún daño innecesario le sobreviniera y cada cual sería responsable por faltar en cuanto a este respecto. Cualquier demandado que negligentemente le ocasionara daño, y cualquier demandado a cargo de velar por su cuidado, que por su descuido permitiera la ocurrencia del daño, será responsable. Los patronos demandados responderán por la negligencia de sus empleados; y el doctor a cargo de la operación responderá por la negligencia de aquellos que se hayan convertido en sus sirvientes temporeros (*temporary servants*) con el propósito de asistirle en la operación.

"Nosotros meramente sostenemos que cuando un demandante recibe daños extraordinarios mientras se encuentra inconsciente

y en el curso de tratamiento médico, todos aquellos demandados que tenían algún control sobre su cuerpo pueden ser llamados convenientemente para rebatir la inferencia de negligencia mediante una explicación de su conducta."

No discutiremos aquí la responsabilidad del médico como tal, ya que la acción contra éste fue desestimada por acuerdo de las partes.

█ El hecho de que el demandante no haya podido explicar la causa del accidente no obstante haber alegado actos específicos de negligencia, tampoco impide la aplicación de la doctrina. Se dijo en *Román* v. *Mueblería Central*, 72 D.P.R. 341, 343 (De Jesús) (1951):

". . . es considerable el número de jurisdicciones que sostienen que cuando las circunstancias del caso son de tal naturaleza que el accidente no hubiera ocurrido a no haber sido por la exclusiva negligencia del demandado y el demandante no tiene medios a su alcance para probar la causa del accidente, la doctrina debe aplicarse a pesar de haberse alegado hechos específicos de negligencia, que el demandante intentó, pero no pudo probar. *Tenney* v. *Enkeball*, 158 P.2d 519 (Ariz. 1945); *Johnson* v. *Greenfield*, 198 S.W.2d 403 (Ark. 1946); *Firszt* v. *Capitol Park Realty Co.*, 120 Atl. 300 (Conn. 1923); *Morgan* v. *Yamada*, 26 Haw. 17 (1921); *Partin's Adm'r* v. *Black Mountain Corporation*, 58 S.W.234 (Ky. 1933); *Lawson* v. *Clawson*, 9 A.2d 755 (Md. 1939); *McNamara* v. *Boston & M.R.R.*, 89 N.E. 131 (Mass. 1909); *McNeill* v. *Durham & C.R. Co.*, 41 S.E. 383 (N.C. 1902); *Markowitz* v. *Liebert & Obert*, 43 A.2d 794 (N.J. 1945); *Boyd* v. *Portland Electric Co.*, 66 Pac. 576 (Ore. 1901); *Boykin* v. *Chase Bottling Works*, 222 S.W.2d 889 (Tenn. 1949); *Blaisdell* v. *Blake*, 11 A.2d 215 (Vt. 1940); *Washington-Virginia Ry. Co.* v. *Bouknight*, 75 S.E. 1032 (Va. 1912); *D'Amico* v. *Conquista*, 167 P.2d 157 (Wash. 1946); Fleming James, Jr., *Proof of the Breach in Negligence Cases*, 37 Va. L. Rev. 179, 215 *et seq.* (1951) y F. Fernández Cuyar, *Res Ipsa Loquitur*, I Revista de Derecho, Legislación y Jurisprudencia, 64 (1935)."

Ver, además, Prosser *On Torts*, 2d ed., 1955, pág. 214; *Rodríguez* v. *White Star Bus Line*, 54 D.P.R. 310 (1939).

█ En cuanto al efecto que ha reconocido este tribunal a la doctrina *res ipsa loquitur* es que la misma establece una inferencia permisible de negligencia. Autoriza pero no obliga al tribunal a deducir que hubo negligencia de la simple relación de las circunstancias bajo las cuales ocurrió el accidente. *Hermida* v. *Feliciano*, supra, pág. 60; *Sweeney* v. *Erving*, 228 U.S. 233 (1913): "Lo que hace es disponer que una vez se han establecido los hechos que justifican su aplicación, el demandante está relevado de la regla general que le exige probar previamente la negligencia del demandado, surgiendo en su lugar una presunción de negligencia, como cuestión de evidencia circunstancial, sin que medie prueba directa para ello, y el peso de continuar con la prueba es trasladado en ese momento al demandado, quien debe demostrar que empleó el debido cuidado." *Rodríguez* v. *Aponte*, 78 D.P.R. 756, 761 (1955); Prosser, *Procedural Effect of Res Ipsa Loquitur*, 20 Minn. L. Rev. 241 (1936). Sobre el efecto procesal de la doctrina, véase *Ramos* v. *Autoridad Fuentes Fluviales*, 86 D.P.R. 603 (Blanco Lugo) (1962).

█ No habiendo demostrado el hospital que no fue por su negligencia que ocurrió el accidente, debe prevalecer en su contra la inferencia de negligencia que conlleva la doctrina. Véanse *Román* v. *Mueblería Central*, supra, pág. 345; *Martínez* v. *U.S. Casualty Co.*, 79 D.P.R. 596, 603 (1956). Al inferir negligencia el tribunal inferior lo hizo haciendo uso de su soberana facultad de apreciar los hechos. Creemos que la ejercitó razonablemente. *Hermida* v. *Feliciano*, supra, pág. 61. Ha sido norma de este Tribunal sostener la apreciación de la prueba que hacen los jueces sentenciadores excepto en casos de error manifiesto, de clara arbitrariedad o de prejuicio y pasión. *E.L.A.* v. *Cía. de Ferrocarriles de P.R.*, 83 D.P.R. 587, 590 (1961).

## II

En el segundo error señalado se impugna la cuantía concedida a la parte recurrida como excesiva y desproporcionada

a la naturaleza del daño. Lo estimamos cometido. El examen de la prueba nos ha convencido de ello. *Deben modificarse las compensaciones concedidas en la siguiente forma: Se rebajará la suma de $5,000 concedida a la señora demandante a $3,000, y la de $800 concedida a su esposo a $300.00, y así modificada, debe confirmarse la sentencia recurrida.*