María Josefa Fernández Vda. de Fornaris et al., demandantes y recurridos, *v.* American Surety Company of New York y Radiotelephone Communicators of Puerto Rico, Inc., demandados y recurrentes.

*Números:* R-63-296    *Resueltos:* 24 de enero de 1966
R-63-201

*Hartzell, Fernández & Novas,* abogados de los recurrentes; *Alberto Picó, Francisco Ponsa Feliú* y *A. Torres Braschi,* abogados de los recurridos.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Hernández Matos, Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

### I.

En esta acción de daños y perjuicios se plantea si se aplica la ley sustantiva de St. Thomas, la de Puerto Rico o la ley federal de los Estados Unidos. También se plantea si se debe aplicar o no la doctrina de *res ipsa loquitur.*

Los hechos son los siguientes. El sábado 20 de julio de 1957 como a las 4:30 P.M. salieron en un avión privado en viaje de placer de San Juan, Puerto Rico, hacia la vecina isla

de St. Thomas cuatro personas. Eran estos Carlos J. Alonso, Fernando Fornaris hijo, Luis Ríos Algarín y Antulio Guillermo Molina. Pilotaba el avión Carlos J. Alonso, quien era Vice-Presidente y accionista principal de la demandada Radiotelephone Communicators of Puerto Rico, Inc. Dicha corporación era dueña del aeroplano en que viajaban; un Cessna, de un motor, de cuatro asientos, modelo 182.

El avión estaba matriculado y regularmente estacionado en San Juan. Las cuatro personas antes mencionadas eran residentes y ciudadanos de Puerto Rico. La Radiotelephone Communicators es una corporación doméstica. La codemandada American Surety Co. of New York es una corporación extranjera autorizada para hacer negocios en Puerto Rico. También son ciudadanos y residentes de Puerto Rico los demandantes. Ríos Algarín, abogado de profesión, era secretario de Radiotelephone Communicators; Molina, contable, trabajaba para dicha corporación. Fornaris era abogado, con práctica en Puerto Rico.

El avión Cessna llegó sin novedad esa tarde a St. Thomas. En la noche de ese día, a las 11:29 P.M., salió dicho avión de regreso a Puerto Rico con los mismos cuatro ocupantes. Pilotaba, igual que antes, Carlos Alonso. Según el plan de vuelo el avión debía aterrizar en Puerto Rico 36 minutos más tarde, esto es, a las 12:05 A.M. del 21 de julio. El avión nunca llegó a Puerto Rico. No se supo más de él ni de sus pasajeros. La presunción no cuestionada es que el avión tuvo un accidente en algún momento durante su viaje de regreso, que se hundió en el mar y que perecieron sus cuatro pasajeros.

Los demandantes son familiares inmediatos de los fenecidos Fornaris, Ríos Algarín y Molina. Son los siguientes: La viuda, tres hijos, el padre y dos hermanos de Fernando Fornaris hijo; la viuda y dos hijos de Ríos Algarín; y la viuda, tres hijos y la madre de Antulio Molina. Las demandadas son la corporación dueña del avión y su aseguradora. La demanda en daños y perjuicios fue por la suma de $500,000.00.

El Tribunal Superior declaró con lugar la demanda y condenó a las demandadas a pagar solidariamente a los demandantes la suma de $255,000.00 más las costas y $20,000.00 de honorarios de abogado. Previa moción de reconsideración de las demandadas, el Tribunal Superior dejó sin efecto la condena de honorarios de abogado pero ratificó los demás extremos de la sentencia. De la sentencia han recurrido a nosotros las demandadas y de aquella parte de la misma, según modificada por la resolución dejando sin efecto la condena de honorarios, han recurrido los demandantes. Hemos consolidado ambos recursos.

Las recurrentes señalan cuatro errores, los cuales resumimos a continuación: (1) Que el Tribunal Superior erró al aplicar la ley de Puerto Rico. (2) Que el Tribunal erró "al descartar y no darle peso alguno a la prueba presentada por las demandadas-recurrentes y a la ofrecida pero no admitida, sobre el lugar donde ocurrió el alegado accidente, incurriendo asimismo en otro error al no admitir tal prueba." (3) Que el Tribunal erró al resolver que el accidente se debió exclusivamente a la negligencia del piloto Alonso y al aplicar la doctrina de *res ipsa loquitur* no obstante la admisión de los demandantes en el sentido de que desconocían la forma en que ocurrió el accidente. (4) Que el Tribunal erró al condenar a las demandadas a pagar la antes mencionada compensación, privando de ese modo a las demandadas de su propiedad sin el debido proceso de ley en violación de las Constituciones de Puerto Rico y de los Estados Unidos.

■ Veamos en primer lugar el papel que juega—o que no juega—en este caso la ley federal. En 1920 el Congreso de los Estados Unidos aprobó la ley conocida como "Death on the High Seas Act," 41 Stat. 537; 46 U.S.C. secs. 761–767. Mediante dicha ley se creó una causa de acción para cubrir aquellos casos en que ocurriese una muerte en alta mar debido a culpa o negligencia y se le confirió jurisdicción a las

Cortes de Distrito de los Estados Unidos, actuando como Tribunales de Almirantazgo, para conocer de esas causas.

■ Aunque se considera que no hay duda de que la intención legislativa fue proveer una causa de acción por muertes relacionadas con accidentes ocurridos en embarcaciones, la jurisprudencia ha extendido la aplicación de dicha ley a muertes ocurridas en alta mar como resultado del tránsito aéreo. V. Anotación, *"Proper forum and right to maintain action for airplane accident causing death over or on high seas,"* 66 A.L.R.2d 1002, 1004.

Habiéndose aceptado que la referida ley federal cubre los casos de muertes por accidentes aéreos en alta mar, queda aún por dilucidar la cuestión de si los tribunales estatales tienen jurisdicción para conocer de un pleito de esa naturaleza mediante el reconocimiento de una causa de acción ejercida al amparo de la ley estatal. Es decir, si las esferas federal y estatal tienen jurisdicción concurrente o si, por el contrario, la jurisdicción federal es exclusiva.

La Sec. 7 de la antes citada ley federal dispone, en parte, que "Las disposiciones de cualquier ley estatal que cree o reglamente causas de acción por muertes no serán afectadas por esta ley." [1]

Parece, a primera vista, que ese lenguaje permite en esos casos la jurisdicción concurrente de las esferas federal y estatal. Sin embargo, la interpretación que a dicha ley le han dado los tribunales no es uniforme y existen sobre ello tres posiciones principales: Una, que excluye totalmente la concurrencia estatal; otra, que la permite a base de la disposición antes transcrita; y una tercera, que permite la concurrencia estatal siempre y cuando que los derechos sustantivos de los litigantes bajo la ley estatal concuerden en su extensión y limitaciones con los provistos por el estatuto

---

[1] "The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter."— 46 U.S.C. sec. 767.

federal. Sin embargo, el peso de las autoridades se inclina a favor de la primera posición antes mencionada. *Jennings* v. *Goodyear Aircraft Corp.*, 227 F.Supp. 246 (1964); *Ledet* v. *United Aircraft Corp.*, 176 N.E.2d 820 (1961); *Blumenthal* v. *U.S.*, 189 F.Supp. 439 (1960), confirmado en 306 F.2d 16; *Higa* v. *Transocean Airlines*, 230 F.2d 780 (1955), *cert. den.* 352 U.S. 802; *Wilson* v. *Transocean Airlines*, 121 F.Supp. 85 (1954); *Sierra* v. *Pan American World Airways, Inc.*, 107 F.Supp. 519 (1952); *Noel* v. *Línea Aeropostal Venezolana*, 247 F.2d 677 (1956); cf. *The Tungus et al.* v. *Skovgaard*, 358 U.S. 588, 593–594 (1958); *Southern Pacific Co.* v. *Jensen*, 244 U.S. 205 (1916). Véanse, además, la antes citada Anotación en 66 A.L.R.2d 1002; la Nota, *"Admiralty: Uniformity: Application of State Statute to Maritime Contract,"* 36 Cornell L.Q. 355 (1951); y 1 Kreindler, *Aviation Accident Law*, (1963) sec. 2.10, págs. 74 *et seq.*

Aunque el Tribunal Supremo de los Estados Unidos no se ha pronunciado específicamente sobre este punto, en el caso de *The Tungus et al.* v. *Skovgaard*, supra, expresó lo siguiente, a las págs. 593–594:

"El historial legislativo del 'Death on the High Seas Act' demuestra un claro propósito congresional de dejar 'vigente los derechos bajo las leyes estatales en cuanto a muertes ocurridas en aguas dentro de la jurisdicción territorial de los Estados.' [Citas omitidas.] El récord del debate habido en la Cámara de Representantes antes de la adopción de la ley refleja una profunda preocupación porque los poderes de los Estados para crear acciones en casos de muertes culposas no sean afectados en forma alguna por la aprobación de la ley federal. [Cita omitida.]

"No tiene mérito la contención de que la aplicación del derecho estatal para determinar derechos que surjan por una muerte en las aguas territoriales estatales destruye la uniformidad del derecho marítimo federal."

Como puede verse, este lenguaje se circunscribe al poder de los Estados para reglamentar lo relativo a muertes ocurridas en sus aguas jurisdiccionales. Creemos probable que

el argumento de la deseabilidad de la uniformidad en cuanto al derecho marítimo se refiere, aducido en *Southern Pacific Co.* v. *Jensen,* supra, en adición al historial legislativo del "Death on the High Seas Act," servirán de base para que el Tribunal Supremo federal le niegue, llegado el momento, jurisdicción a los Estados sobre muertes ocurridas en alta mar.

■ No obstante lo anteriormente apuntado, el caso de autos no está cubierto por el estatuto federal. Ello es así porque la evidencia producida en el juicio no prueba, y ni siquiera es suficiente para que concluyamos, mediante inferencia, que el Cessna 182 cayó en alta mar. Ésta también es la apreciación del Tribunal de instancia. En relación con esto, es muy significativo que, conforme estipularon las partes en la conferencia anterior al juicio "los demandantes radicaron una demanda sobre estos mismos hechos en la Corte de los Estados Unidos para el Distrito de Puerto Rico, el día 24 de septiembre de 1958 y que se desistió de esa acción el día 9 de enero de 1962." Naturalmente, el no poder los demandantes probar en la Corte de Distrito de los Estados Unidos que el accidente ocurrió en alta mar no pudieron establecer la jurisdicción federal. Posteriormente acudieron al Tribunal Superior de Puerto Rico con el resultado ya dicho.

Lo antes dicho sobre el lugar en donde ocurrió el accidente nos deja frente a la alternativa de que el mismo ocurrió o en aguas de St. Thomas o en aguas de Puerto Rico.

Los demandantes admiten que no saben cómo ni dónde ocurrió el accidente, pero, aceptado que lo hubo y que en él perdieron la vida sus antes nombrados familiares, aquéllos descansan en la doctrina de *res ipsa loquitur*—la cosa habla por sí sola—para recobrar daños de las demandadas.

Las demandadas, por su parte, tomaron la posición en el Tribunal Superior que el accidente ocurrió en aguas territoriales de las Islas Vírgenes o en alta mar. La posibilidad

de que el accidente hubiese ocurrido en alta mar la dejaron abierta las demandadas como una segunda línea de defensa, pero realmente se esforzaron por demostrar que el accidente ocurrió en aguas de las Islas Vírgenes. En su memorando de 12 de noviembre de 1963, radicado en el Tribunal Superior después de que éste hubo fallado el caso, las demandadas expresan y admiten que el Tribunal Superior "rechazó la contención de las demandadas de que el accidente ocurrió en la jurisdicción de la Isla de San Tomás, Islas Vírgenes."

Abundando en esa posición, las demandadas, en su alegato de 26 de abril de 1965, a la pág. 15, nos señalan que en los procedimientos sobre declaratorias de herederos instados ante el Tribunal Superior, en el año 1957 cuando aún no había acción judicial alguna reclamando daños sufridos por los demandantes, éstos utilizaron una declaración del Almirante Ryssy y que en aquella ocasión el Almirante declaró que el avión "cayó al agua en algún punto entre Carlota Amalia y el Paso de Savana." (²) El Paso de Savana es un estrecho que se encuentra al Oeste de St. Thomas entre dicha isla y la Isla de Savana. La distancia entre la costa Oeste de St. Thomas y la costa Este de Savana—distancia que forma el estrecho conocido como Paso de Savana—es de 2 millas. Las aguas del Paso de Savana son aguas territoriales o jurisdiccionales de St. Thomas.

Ante nosotros, las demandadas han tomado las siguientes posiciones en relación con el lugar en que ocurrió el accidente: (a) En su Petición de Revisión de 20 de diciembre de 1963, expresan las demandadas que si un testigo suyo, el Almirante Ryssy, hubiese declarado éste hubiese dicho

---

(²) La declaración exacta, hecha bajo juramento, del Almirante Ryssy fue la siguiente: "Estudiando la información que tengo a mano, es mi opinión que el Cessna N6084B cayó al agua en algún punto entre Carlota Amalia y el Paso de Savana."

El Almirante Ryssy era para la época de los sucesos el Comandante de la Guardia Costanera de los E.U. en San Juan y en las Antillas. El estuvo a cargo de las operaciones de búsqueda del avión perdido y fue personalmente a Islas Vírgenes con motivo de dicha búsqueda.

que el avión "cayó en aguas jurisdiccionales de San Tomás." (b) En su alegato suplementario de 30 de septiembre de 1964 afirman, luego de citar un fragmento de la declaración del Almirante Ryssy, que dicha declaración constituye prueba de que el Cessna 182 "cayó en aguas de San Tomás o bien en alta mar." (c) En su tercer alegato, fechado a 26 de abril de 1965, las demandadas nos dicen que "todas las referencias del Almirante Ryssy a las cartas marítimas marcadas G, H e I quedan en alta mar." Como puede verse, la posición (b) no nos ayuda y las posiciones (a) y (c) son contradictorias entre sí, lo cual tampoco nos ayuda.

¿Cuál es, entonces, la situación sobre el asunto? En materia de daños y perjuicios la aplicación de la ley federal es la excepción y para que ésta sea aplicable hay que probar la jurisdicción federal. De aplicarse, sería en un tribunal federal, a tenor con el estatuto antes citado. Para que se aplicase dicha ley en este caso era necesario probar que el accidente ocurrió en alta mar. Esto no se probó y por lo tanto, no podemos concluir que se aplica la ley federal.

El Tribunal de instancia estimó insuficientes los esfuerzos de las demandadas para demostrar que el accidente ocurrió en aguas de St. Thomas. Es cierto que no hay prueba directa que demuestre dónde ocurrió el accidente. También se hace difícil llegar a una conclusión sobre el particular debido a las diversas teorías contradictorias que las demandadas han sustentado en distintas etapas de este litigio.

■ Sin embargo, como ya hemos dicho, no podemos presumir, en ausencia de prueba, que el accidente ocurrió en alta mar. Habiendo ya eliminado la posibilidad de la aplicación de la ley federal, nos quedan las alternativas de que el accidente ocurriese en aguas de Puerto Rico o de las Islas Vírgenes, y creyendo como creemos que a base de toda la prueba la inferencia más razonable es que el avión cayó en aguas de St. Thomas, así lo aceptamos. Esa es la inferencia que nos parece más razonable; esa fue la posición original

de las demandadas ante el Tribunal de instancia; presentaron prueba a ese efecto; y los demandantes no presentaron prueba alguna que la contradijese.

## II.

◼ Definida ya nuestra posición ante los hechos, debemos ahora determinar qué derecho se les debe aplicar y luego consideraremos si hay o no responsabilidad civil de parte de las demandadas. El problema, claro está, es ver si se aplica la ley de las Islas Vírgenes vigente a la fecha del suceso (*lex loci delicti*) o si se aplica la ley de Puerto Rico (*lex fori*). Como ambas leyes son muy distintas, en su letra y en la política pública que las informa, estamos ante un clásico ejemplo de conflicto de leyes. El asunto no está resuelto en nuestro derecho escrito, de manera que debemos escoger la norma que vamos a seguir en esta jurisdicción sobre el particular.

Antes de continuar veamos brevemente las dos leyes en conflicto. Para la fecha en que el accidente ocurrió la legislación de Islas Vírgenes limitaba a un máximo de $10,000.00 la cuantía a recobrarse como compensación por daños en casos como el de autos. V. 5 V.I.C. § 75, Historial, cf. *Fleming* v. *Hagemann*, 1 V.I.R. 32 (1923); *Tebbs* v. *Alcoa Steamship Co.*, 3 V.I.R. 186 (1956) y *Tebbs* v. *Alcoa Steamship Co.*, 3 V.I.R. 592 (1957).[3] De ser aplicable a este caso dicha legislación nos veríamos forzados a conceder, de haber derecho a ello, una compensación no mayor de $10,000.00 por persona. (No es necesario elaborar para que se comprenda lo injusto y arbitrario que una limitación de esa clase puede resultar en los casos en que se justifique una compensación mayor.) Si por el contrario es aplicable el derecho vernáculo, la compensación se fijaría en vista de los

---

[3] Posteriormente, dicha legislación fue derogada y al presente no existe límite alguno en cuanto a la cuantía a recobrarse. V. 5 V.I.C. sec. 76. Cf. *Williams* v. *Dowling*, 4 V.I.R. 465 (1963).

daños judicialmente probados y justipreciados ya que en Puerto Rico no existe una limitación similar a la que existía en las Islas Vírgenes. La ley federal tampoco tiene una limitación de esa naturaleza.

Tenemos que reconocer al comienzo de la discusión del problema aquí planteado por el conflicto de leyes, que la regla tradicional favorecía la norma *lex loci delicti*. El Código Civil nuestro y su antecesor el español guardan silencio sobre el asunto pero España se ha adherido a la citada regla tradicional. Es significativo, sin embargo, que lo ha hecho "en atención a que precisamente el Estado de dicho lugar [donde ocurre el acto torticero] es el que tiene un interés acusado en que no se realice el acto prohibido, o en que, de realizarse, haya lugar a las relaciones jurídicas correspondientes," como nos dice Castán, (4) o porque se cree que "debe acudirse al punto de enlace de mayor relieve . . ." como lo expresan Pérez y Alguer. (5). Notemos desde ahora que la posición española no es caprichosa sino que se basa en que debe aplicarse la ley del Estado que tenga mayor interés en que no se cometa el acto torticero o en que si se comete se haga la reparación debida; o dicho de otra manera, en que debe aplicarse la ley del Estado que tenga el enlace (contactos, dicen en inglés los autores) de mayor importancia.

El derecho norteamericano ha sido fecundo en la producción de teorías sobre el particular. Se reconocen las siguientes: (1) la teoría de la cortesía (*"comity"*) propulsada por Story; (2) la teoría de los derechos creados (*"vested rights"*) que se asocia con Beale y Holmes; (3) la teoría *"local"* de Cook y Hand; (4) la teoría, ya bastante generalizada, de "agrupamiento de contactos," también conocida por los nombres de "contactos dominantes," de "centro de gravedad," y

---

(4) *Derecho Civil Español, Común y Foral*, 10ma. ed. (1962), Tomo I, Vol. 1, pág. 499.

(5) En sus notas a su traducción del *Tratado de Derecho Civil* de Enneccerus, Kipp y Wolff, 2da. ed. (1953), Tomo I, Vol. 1, pág. 277.

de "la relación más significativa"; y (5) la teoría llamada en inglés la de los "intereses gubernamentales" de Currie. Esta última se parece a la teoría de "agrupamiento de contactos" y en español habría que llamarla de otra manera pues su énfasis está en consideraciones de política pública y no meramente burocráticas. (6) No creemos que se justifica que hagamos aquí una explicación de las diversas escuelas o teorías antes mencionadas pues eso ya se ha hecho. Véase Cheatham, *"American Theories of Conflicts of Laws: Their Role and Utility,"* 58 Harv. L. Rev. 361 (1945); y para excelentes discusiones sobre las tendencias contemporáneas véase el simposio *"New Trends in the Conflict of Laws"* en 28 Law & Contemp. Prob. 673 y ss. (1963) donde hay colaboraciones de los profesores Reese, Ehrenzweig, Leflar, Currie y otros.

La posición tradicional en el derecho norteamericano fue también la de seguir la regla de *lex loci delicti.* Así se recogió en el primer *Restatement.* V. *Restatement of the Law of Conflict of Laws* (1934) secs. 378, 379, 383, 384, 391. V. también Leflar, *Conflict of Laws* (1959) sec. 110; Goodrich, *"Tort Obligations and the Conflict of Laws,"* 73 U. Pa. L. Rev. 19 (1924). Se le reconocen a dicha regla varias ventajas, como por ejemplo: (1) da un tratamiento uniforme a la materia; (2) desalienta la búsqueda de foros más convenientes *("forum shopping")*; (3) es fácil de aplicar; y (4) produce certeza y facilidad de predicción.

Pero no obstante las ventajas apuntadas, dicha doctrina adolece de tan serias deficiencias sustanciales que desde temprano los juristas enfilaron sus críticas contra ella y los tribunales comenzaron a encontrarle excepciones a fin de evitar su aplicación injusta y a ciegas. Sobre la mencionada reacción de los autores pueden verse, citados en orden crono-

---

(6) Los términos "estado" y "gobierno," y sus derivados, no tienen una connotación peyorativa en la semántica de los pueblos anglosajones, más experimentados éstos en el gobierno propio y acostumbrados a ver al estado y al gobierno como algo suyo y no ajeno.

lógico, Lorenzen, *"Territoriality, Public Policy and the Conflict of Laws,"* 33 Yale L.J. 736 (1924); Yntema, *"The Hornbook Method and the Conflict of Laws,"* 37 Yale L.J. 468 (1928); Lorenzen, *"Tort Liability and the Conflict of Laws,"* 47 L.Q. Rev. 483 (1931); Cook, *"Tort Liability and the Conflict of Laws,"* 35 Colum. L. Rev. 202 (1935); Rheinstein, *"The Place of Wrong: A Study in the Method of Case Law,"* 19 Tul. L. Rev. 4, 165 (1944); Cheatham, *"American Theories of Conflict of Laws: Their Role and Utility,"* 58 Harv. L. Rev. 361 (1945); Morris, *"The Proper Law of a Tort,"* 64 Harv. L. Rev. 881 (1951); Currie, *"Survival of Actions: Adjudication Versus Automation in the Conflict of Laws,"* 10 Stan. L. Rev. 205 (1958); Stumberg, *"The Place of the Wrong: Torts and the Conflict of Laws,"* 34 Wash. L. Rev. 388 (1959); Ehrenzweig, *"The Lex Fori-Basic Rule in the Conflict of Laws,"* 58 Mich. L. Rev. 637 (1960); Currie, *"Conflict, Crisis and Confusion in New York,"* 1963 Duke L.J. 1. De la jurisprudencia nos ocuparemos en breve.

En contraposición a las "ventajas" anteriormente enumeradas de la doctrina *lex loci delicti* se le hacen las siguientes críticas: (1) se caracteriza por proveer un tratamiento mecánico a los casos; (2) no considera cuestiones de política pública; (3) considera un solo factor (el lugar donde ocurrió el daño) como importante; y (4) es un sistema rígido que antepone la facilidad y certeza a la justicia. Véanse los comentarios de los profesores Cavers, Cheatham, Currie, Ehrenzweig, Leflar y Reese en 63 Colum. L. Rev. 1212–1257 (1963); el Simposio antes citado en 28 Law & Contemp. Prob. 673 y ss.; Sherwood, *"Babcock v. Jackson: The transition from the Lex Loci Delicti Rule to the Dominant Contacts Approach,"* 62 Mich. L. Rev. 1359 (1964); Hase, *"Babcock v. Jackson: A Possible Solution to Conflicts Confusion in Wisconsin,"* Vol. 1964 Wis. L. Rev. No. 2, pág. 316; Nota, *"Lex Loci Delicti Rejected in Torts Conflicts of Law,"* 25 Md. L. Rev. 238 (1965); Nota, *"Conflicts of Laws—Torts—*

*Repudiation of Place of Injury Rule,"* 17 Vand. L. Rev. 283 (1963); Nota, *"Conflicts of Laws—Law of Place of Tort Abandoned in favor of 'Grouping of Contacts' Theory,"* 15 Syracuse L. Rev. 78 (1963); Nota, 38 Tul. L. Rev. 398 (1964); Cheatham, *"American Theories of Conflict of Laws: Their Role and Utility,"* 58 Harv. L. Rev. 361 (1945); Stumberg, *"The Place of the Wrong—Torts and the Conflict of Laws,"* 34 Wash. L. Rev. 388 (1959); Currie, *"On the Displacement of the Law of the Forum,"* 58 Colum. L. Rev. 964 (1958). Este último artículo aparece también en *Selected Essays on the Conflict of Laws* (1963) del mismo autor. [7]

Como señalamos antes, los tribunales se han negado durante los últimos años, a aplicar a ciegas la doctrina rígida de *lex loci delicti.* El desarrollo de la jurisprudencia reciente sobre el particular es la historia de una creciente erosión de dicha regla. Veamos brevemente algunos casos específicos.

En *Gordon* v. *Parker,* 83 F.Supp. 40 (1949) se planteó la situación de si debía aplicarse la ley de Massachusetts o la de Pennsylvania a una acción por privación de afecto (*"alienation of affections"*). La acción se instó en Massachusetts contra un residente de dicho estado. El domicilio del matrimonio era Pennsylvania y allí se causó el perjuicio. En Pennsylvania no se reconocía esa causa de acción pero sí en Massachusetts. El Tribunal, luego de hacer mención de la doctrina tradicional, procedió a analizar los intereses de los respectivos Estados en el resultado del pleito y concluyó que el interés de Massachusetts en desalentar ese tipo de conducta era superior al interés de Pennsylvania al negarse a reconocer esa acción, y aplicó la ley del foro. Aunque no se dijo expresamente la decisión fue un rechazo implícito a la doctrina de *lex loci delicti.*

---

(7) El *Annual Survey of American Law* de 1964, a la pág. 69, considera este libro del Profesor Currie como la publicación más importante del año en materia de conflicto de leyes.

En *Dale System* v. *Time*, 116 F.Supp. 527 (1953) se trataba de una acción de daños basada en un libelo publicado en varios estados. El tribunal concluyó que se aplicaba el derecho del domicilio del demandante perjudicado y no trató de determinar en qué otros estados el demandante había sufrido perjuicio, ni cuál de sus leyes se aplicaba.

En *Grant* v. *McAuliffe*, 264 P.2d 944 (1953), el daño tuvo lugar en Arizona pero todas las partes envueltas en el pleito eran residentes de California. El Tribunal Supremo de California aplicó la ley de ese estado. Aparentemente todavía dicho tribunal no estaba preparado para rechazar expresamente la doctrina tradicional y para hacerlo acudió a la ficción de que el asunto era procesal.[8]

*Schmidt* v. *Driscoll Hotel*, 82 N.W.2d 365 (1957), es un caso significativo en este historial del rechazo de la aplicación a ciegas de la doctrina *lex loci delicti*. Nótese la similitud, no en los hechos, pero sí en el problema planteado, con el caso de autos.

En *Schmidt* el único punto de enlace o contacto de Wisconsin con el caso fue que allí tuvo lugar el accidente automovilístico en que resultó perjudicado el demandante. Las partes eran residentes de Minnesota. Dentro de los hechos particulares del caso, la ley de Minnesota proveía una causa de acción al demandante que la ley de Wisconsin no reconocía. Desde luego, de aplicarse la ley de Wisconsin, lugar del daño, el demandante hubiese perdido su causa de acción dádale por la ley de su estado, Minnesota. El tribunal dijo que la doctrina *lex loci delicti* no debía aplicarse en una situación en la cual el resultado hubiese estado reñido con

---

(8) El autor de esa opinión, el muy eminente y respetado Juez Presidente del Tribunal Supremo de California, Roger J. Traynor, escribió más tarde, y con su característica honradez intelectual, lo siguiente sobre su propia opinión: "It may not be amiss to add that although the opinion in the case is my own, I do not regard it as ideally articulated, developed as it had to be against the brooding background of a petrified forest." 37 Texas L. Rev. 657, 670 (1959).

los principios de equidad y de justicia, y abiertamente rehusó hacer una aplicación mecánica de la citada regla tradicional.

En *Haumschild* v. *Continental Casualty Co.*, 95 N.W.2d 814 (1959), el tribunal resolvió que la cuestión de si un esposo puede demandar a otro debe resolverse de acuerdo con la ley del domicilio del matrimonio y rehusó aplicar la ley del estado en donde ocurrió el daño. Como puede verse, aquí también se rechazó la regla tradicional. El tribunal reconoció que el problema planteado estaba considerablemente relacionado con la política pública del estado en el cual el matrimonio tenía su domicilio. El tribunal expresó, a la pág. 818, que "hay que reconocer que en el campo de conflicto de leyes los principios absolutos no pueden ser el fin del derecho a costa de una sensata política pública."

El famoso(⁹) caso de *Kilberg* v. *Northeast Airlines*, 172 N.E.2d 526 resuelto en 1961 por el Tribunal de Apelaciones de Nueva York debilitó casi mortalmente la doctrina que aquí discutimos. Este caso guarda mucha similitud con el de autos. El accidente aéreo tuvo lugar en Massachusetts, en donde había una limitación estatutaria de una compensación máxima por daños de $15,000.00. La víctima era de Nueva York y allí se vio el caso.

El Tribunal de Nueva York, sin todavía rechazar expresamente la vieja doctrina, lo hizo como cuestión de hecho al resolver que esa limitación de $15,000.00 no era aplicable. El Tribunal racionalizó su decisión diciendo que se trataba de una cuestión procesal y que además la ley de Massachusetts era contraria a la política pública del estado de Nueva York. Nueva York no tenía una limitación a la cuantía recobrable como la de Massachusetts. Para llegar al resultado que creyó justo, el tribunal hizo caso omiso de las autoridades que sostienen que la cuantía de la compensación en

(⁹) 61 Colum. L. Rev. 1497 (1961); 46 Cornell L.Q. 637 (1961); 49 Geo. L.J. 768 (1961); 74 Harv. L. Rev. 1652 (1961); 15 Rutgers L. Rev. 620 (1961); 28 U. Chi. L. Rev. 733 (1961); 47 Va. L. Rev. 692 (1961).

daños es materia sustantiva, *Western Union Tel. Co.* v. *Brown*, 234 U.S. 542 (1914) ; *Northern Pac. R.R.* v. *Babcock*, 154 U.S. 190 (1894). Es interesante el dato de que Nueva York rechazó posteriormente la caracterización de la limitación de cuantía como un asunto procesal en *Davenport* v. *Webb*, 183 N.E.2d 902 (1962).

En *Pearson* v. *Northeast Airlines*, 309 F.2d 553 (1962), el Tribunal de Apelaciones del Segundo Circuito sostuvo lo resuelto en *Kilberg*, supra. El Tribunal señaló específicamente, a la pág. 559, que cuando un Estado tiene contactos sustanciales con los hechos de un caso tiene un perfecto derecho constitucional para aplicar la ley del foro. Insistiendo en la constitucionalidad de la decisión de Nueva York, el Tribunal expresó, a la pág. 561, que Nueva York tenía derecho a sopesar la importancia de los contactos de los distintos estados con el caso y a aplicar su propio derecho, sin violar la Constitución (cláusula de entera fe y crédito) una vez convencido de que sus contactos eran dominantes.

El análisis que antecede demuestra, creemos, cómo la doctrina *lex loci delicti* fue perdiendo fuerza y prestigio entre los juristas y los tribunales. La jurisprudencia, desde *Gordon*, supra, hasta *Pearson*, supra, demuestra una creciente impaciencia contra la rigidez de dicha doctrina. Casi uniformemente los tribunales prefirieron utilizar los contactos dominantes como la base real para sus decisiones, aunque a veces racionalizaron sus decisiones de suerte que aparentemente éstas quedaban dentro de los contornos del "bosque fosilizado." ([10])

---

([10]) Véase el comentario del Juez Traynor, escolio 8 de esta opinión.

Las personas entrenadas en el estudio del derecho a base de casos saben distinguir la diferencia que a veces hay entre lo que las opiniones dicen y lo que hacen. Hace ya años el Juez Holmes advirtió lo siguiente: "Las consideraciones que los jueces rara vez mencionan . . . son las raíces de las cuales el derecho toma su esencia. Me refiero, desde luego, a las consideraciones de lo que es conveniente para la comunidad concernida. Cada principio importante que surge de la litigación es en realidad y fundamentalmente el resultado de consideraciones, más o menos claramente precisadas, de política pública." *The Common Law*, ed. 1946, pág. 35.

Fue en *Babcock* v. *Jackson*, 191 N.E.2d 279 (1963) donde el Tribunal de Apelaciones de Nueva York rechazó abierta y explícitamente la doctrina de *lex loci delicti* en materia de daños y perjuicios, siendo el primer tribunal en así hacerlo en dicha materia.([11]) Ya antes dicha doctrina había sido casi anulada en materia de contratos, *Vanston* v. *Green*, 329 U.S. 156, 162 (1946) y el mismo Tribunal que resolvió a *Babcock* había rehusado aplicarla en dicha materia, *Auten* v. *Auten*, 124 N.E.2d 99 (1954). Así también lo hicimos nosotros en 1961 en materia de contratos y de seguros. V. *Maryland Casualty Co.* v. *San Juan Racing Assn.*, 83 D.P.R. 559.

*Babcock*, supra, presenta gran semejanza, con el caso de autos. En aquél, tres personas, residentes todas de Nueva York, salieron en automóvil en un viaje de placer al Canadá. En Ontario sufrieron un accidente y una pasajera que resultó lesionada demandó en Nueva York al conductor del vehículo. La ley de Ontario eximía de responsabilidad al conductor pero no así la de Nueva York. Se levantó la cuestión de que la ley del lugar donde ocurrió el daño eximía de responsabilidad civil al demandado.

El Tribunal señaló que la regla de *lex loci delicti* estaba ya desacreditada por rígida e injusta, la calificó de anacrónica y rehusó aplicarla. En cambio, aplicó el derecho de Nueva York, el cual permitía recobrar por los daños causados por la negligencia del conductor. Se basó para ello en la doctrina de los contactos dominantes. Razonó que las partes envueltas eran de Nueva York; que ese Estado les debía protección; que la política pública de Nueva York es en el sentido de que se reparen los daños causados por negligencia; y que el lugar del accidente era un elemento fortuito e irrelevante para la justicia del caso. Señaló el Tribunal que

---

([11]) Sherwood, *"Babcock* v. *Jackson: The Transition From The Lex Loci Delicti Rule to the Dominant Contacts Approach,"* 62 Mich. L. Rev. 1358, 1368 (1964).

Ontario sí tenía interés en la conducta de las personas dentro de su jurisdicción, de manera que Ontario, desde luego, podía hacer efectivas las reglas de tránsito en sus carreteras. Es clara la diferencia.

■ La jurisprudencia anteriormente analizada no nos obliga. *Jiménez y Salellas, Inc.* v. *Maryland Cas. Co.*, 92 D.P.R. 207 (1965); *Banchs* v. *Colón*, 89 D.P.R. 481 (1963); *Reyes* v. *Tribunal Superior*, 84 D.P.R. 29, 31–32 (1961); *Pueblo* v. *Matos*, 83 D.P.R. 335, 341 (1961); *Belaval* v. *Srio. de Hacienda*, 83 D.P.R. 251, 256 (1961); *Cía. Azucarera* v. *Tribunal Contribuciones*, 72 D.P.R. 909, 921 (1951); *Corretjer* v. *Tribunal de Distrito*, 72 D.P.R. 754, 760 (1951); *Pueblo* v. *Mantilla*, 71 D.P.R. 36, 51 (escolio 11) (1950); *Castro* v. *González*, 70 D.P.R. 887, 896 (1950); Wigmore, *On Evidence*, 3ra. ed. (1940), Vol. I, sec. 8a, pág. 245. Pero podemos encontrar válidos sus razonamientos.

Del análisis anterior resultará claro que Puerto Rico, y no St. Thomas, tiene los contactos dominantes con el caso de autos. Éstos están resumidos en el tercer párrafo de esta opinión. El avión, la corporación dueña del mismo, los cuatro pasajeros fallecidos y sus causahabientes (aquí demandantes) eran o son, según sea el caso, de Puerto Rico. A ellos es que Puerto Rico les debe la protección de sus leyes y de su política pública. El lugar del accidente es un factor completamente fortuito y la suerte de las partes en un sistema racional de derecho no debe quedar a merced de un factor tan caprichoso. Adoptamos pues, la doctrina de los contactos dominantes por hallarla más realista y justa y aplicaremos la ley de Puerto Rico. ([12])

■ Con la doctrina que acabamos de enunciar el Tribunal Supremo de los Estados Unidos no tiene querella.

---

([12]) "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización." Arts. 1802 y ss., Código Civil; 31 L.P.R.A. secs. 5141 y ss.

Dicho Tribunal ha expresado que la misma no conflige con las cláusulas de entera fe y crédito (*"full faith and credit"*) y del debido proceso de ley. En *Clay* v. *Sun Insurance Office*, 377 U.S. 179 (1964) encontró que Florida tenía suficientes puntos de enlace—contactos—con el caso para justificar que se aplicase la ley de Florida y no la de Illinois. El Tribunal Supremo federal no ha dictado ninguna regla sobre la selección de la ley a aplicarse en estos casos de conflicto de leyes sino que ha dejado a cada Estado elaborar su propio derecho de colisión de leyes. Es de suponer que los Estados lo harán dentro de un recto sentido de justicia y equidad. Leflar, *"Constitutional Limits on Free Choice of Law,"* 28 Law & Contemp. Prob. 706, 730 (1963); 1964 Annual Survey of American Law 89.

■ Como es de suponer, luego de haber visto la trayectoria que sobre este asunto ha tomado el derecho norteamericano, el *Restatement* se propone abandonar su vieja posición y a adoptar la doctrina de los contactos dominantes. Así, al enunciar el nuevo principio general que propone, la adopta completamente.[13] El Código de Comercio Uniforme también adopta la nueva doctrina, salvo pacto en contrario. *Uniform Commercial Code* (U.L.A.), sec. 1–105; 63 Colum. L. Rev. 1232 (1963); 38 Tul. L. Rev. 399 (1964).

La nueva tendencia en el campo de daños y perjuicios que este caso y *Babcock*, supra, evidencian no es sólo un fenómeno del derecho norteamericano. Puede decirse que es universal el esfuerzo por hacer del Derecho una ciencia al servicio del hombre y de sus mejores ideales y aspiraciones. Para una excelente discusión del asunto en relación con esta misma materia de daños y perjuicios véase el Capítulo 5, *"Tort and Insurance,"* de Friedmann, *Law in a Changing*

---

[13] "The local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort." *Restatement (Second) Conflict of Laws* (Tentative Draft No. 9), 1964, § 379(1).

*Society* (1959).([14]) De los modernos civilistas españoles también nos llegan similares orientaciones. Explicando que al paso que va cambiando el contorno sociológico o cultural de nuestro tiempo también va cambiando la jurisprudencia, y comentando específicamente sobre dicho cambio en relación con el campo de daños y perjuicios, el Profesor Diez-Picazo escribe:

"En el fondo, sin embargo, por debajo de ese fundamento doctrinal, tal vez esté latiendo una intuitiva preocupación, que es, a mi juicio, la raíz última del nuevo Derecho de daños: la necesidad social de defender y de amparar a la persona frente a un maquinismo industrial desencadenado en beneficio de determinadas partes de la sociedad y, sólo indirectamente, de la totalidad de ella." ([15])

■ Como puede apreciarse, al adoptar la doctrina de los contactos dominantes en materia de conflicto de leyes sobre daños y perjuicios, nos hemos hecho cargo de un problema que en derecho es tan antiguo como el derecho mismo. Este es el problema de la necesidad de que el derecho ofrezca seguridad y certeza y a la vez conserve la capacidad de evolucionar con los tiempos y de adaptarse a las nuevas realidades humanas. Esta evolución es necesaria para que el derecho, en cada época y lugar, sea justo. Es el derecho arte y ciencia para servir al hombre y no trampa para inmobilizarlo.

Este problema creado por la necesidad de que haya seguridad en la ley, de un lado, y de su desarrollo constante en busca de la justicia, del otro, es uno que ha ocupado a los

---

([14]) Sobre este libro Pound escribió un artículo y en su último párrafo dijo de dicho libro: "This book does for the law of the predawn of the twenty-first century what Dicey's Law and Public Opinion in England in the Nineteenth Century did for Anglo-American law of the twentieth century. We thought, when I entered teaching as my life work in 1907, that he had taught us the path of the law. But it was the path of the past. Now, I feel assured, we have been clearly shown the path of the century to come." 46 Minn. L. Rev. 117, 141 (1962).

([15]) *"Reflexiones Sobre la Jurisprudencia del Tribunal Supremo,"* Revista de Derecho Privado (Nov. 1964), pág. 929.

filósofos y a los juristas desde la antigüedad pre-cristiana. ([16]) Entre los modernos, es ya clásica la afirmación de Pound: "El Derecho debe tener estabilidad y, sin embargo, no puede permanecer inalterable. Por ello, toda meditación en torno al Derecho ha tratado de reconciliar las necesidades contradictorias de estabilidad y transformación." ([17]) Castán lo ha expresado así: "[E]l Derecho tiene, a un mismo tiempo, dos exigencias, difíciles de armonizar: de un lado, requiere seguridad y certeza, y de otro, movilidad y posibilidades de adaptación a la realidad cambiante." *Teoría de la Aplicación e Investigación del Derecho* (1947), pág. 356. Véanse el mismo asunto tratado en *The Formative Era of American Law* (1938), pág. 13 y en *Law Finding Through Experience and Reason* (1960), pág. 23, ambos libros de Pound. De Stone, Julius, véase *Human Law and Human Justice* (1965), págs. 241 y ss. y también del mismo autor *Legal System and Lawyers' Reasonings* (1964), pág. 323. Con su acostumbrada claridad lo trata Friedmann en *Legal Theory*, 4ta. ed. (1960), pág. 32 y en su *Law in a Changing Society* (1959), pág. 31. Allen lo discute en su *Law in the Making*, 3ra. ed. (1939), págs. 290 y ss. Difícilmente se ha tratado el problema que aquí discutimos con mayor lucidez literaria que como lo hace Cardozo en sus ensayos *Nature of the Judicial Process* (1921) y *Paradoxes of Legal Science* ([18]) (1928).

---

([16]) Cf. nuestra discusión sobre la equidad en *Silva v. Comisión Industrial,* 91 D.P.R. 891 (1965). V. Cairns, *Legal Philosophy From Plato to Hegel* (1949).

([17]) "Law must be stable and yet it cannot stand still. Hence all thinking about law has struggled to reconcile the conflicting demands of the need of stability and of the need of change." *Interpretations of Legal History* (1923), pág. 1. Traducido al español por Puig Brutau con el nombre de *Las Grandes Tendencias del Pensamiento Jurídico* (1950).

([18]) En relación con esta actitud de ahondar en el derecho para extraer su sustancia son característicos de sus autores los siguientes dos comentarios:

De Holmes, "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV."—"The Path of the Law," *Collected Legal Papers* (1920), pág. 187.

Naturalmente, el conflicto perenne que plantea la necesidad de estabilidad y cambio en el derecho no ha de ser resuelto permanentemente en nuestros días. El derecho, como ciencia social viva, comprende dentro de sí la anteriormente mencionada antítesis. Corresponde a cada generación lograr y mantener el balance necesario entre esas dos fuerzas para que el derecho opere con razonable eficacia.

## III.

Nos resta por considerar si es de aplicación o no la doctrina de *res ipsa loquitur* a este caso. No creemos necesario hacer aquí una explicación de dicha doctrina. Recientemente nos hemos ocupado con detenimiento de la misma, *Sociedad de Gananciales, Etc.* v. *Presbyterian Hospital*, 88 D.P.R. 391 (1963); *Ramos* v. *Autoridad de Fuentes Fluviales*, 86 D.P.R. 603 (1962) y su significado e historial están claramente explicados en los textos. Prosser, *The Law of Torts*, 3ra. ed. (1964), págs. 215–239; Harper & James, *The Law of Torts* (1956), Vol. 2, págs. 1075–1107. Para puntos de vista en controversia véase Prosser, *"Res Ipsa Loquitur in California,"* 37 Calif. L. Rev. 183 (1949); Seavey, *"Res Ipsa Loquitur: Tabula in Naufragio,"* 63 Harv. L. Rev. 643 (1950); Jaffe, *"Res Ipsa Loquitur Vindicated,"* 1 Buffalo L. Rev. 1 (1951).

"El problema aquí planteado consiste en determinar si se aplica o no la doctrina de *res ipsa loquitur* en un caso en que un avión desaparece sin dejar rastro alguno," expresó el Tribunal en *Haasman* v. *Pacific Alaska Air Express, Inc.*, 100 F.Supp. 1, 2 (1951). Igual es la situación del caso de autos. En *Haasman*, supra, como en este caso, hacía buen tiempo, no se encontró el avión y no se supo por qué ocurrió

De Llewellyn, "For a mere legal machine is a social danger. Indeed, a mere legal machine is not even a good lawyer. It lacks insight and judgment." *The Bramble Bush*, ed. 1951, pág. 101.

el accidente. El Tribunal concluyó que dicha doctrina era de aplicación al caso.

En los primeros casos de accidentes de aviación los tribunales no aplicaron la doctrina de *res ipsa loquitur*. Se razonaba entonces que todavía la aviación no estaba lo suficientemente desarrollada ni era lo suficientemente segura para que pudiese aplicarse dicha doctrina a accidentes aéreos no explicados en otra forma.([19]) Esa situación jurisprudencial ha cambiado diametralmente. Debido a los progresos tecnológicos en la aviación, y sin duda debido también a la justicia y conveniencia social de poner la pérdida económica sobre la parte que mejor puede soportarla, Prosser, obra citada, pág. 22; Diez-Picazo, artículo citado, pág. 929, la jurisprudencia desde hace años uniformemente aplica dicha doctrina a esta clase de accidentes. *United States* v. *Kesinger*, 190 F.2d 529 (1951); *Rogow* v. *United States*, 173 F.Supp. 547 (1959); *Lobel* v. *American Airlines*, 192 F.2d 217 (1951), *cert. den.* 342 U.S. 945 (1952); *Smith* v. *Pacific Alaska Airways*, 89 F.2d 253 (1937), *cert. den.* 302 U.S. 700 (1937); *Capital Airlines* v. *Barger*, 341 S.W.2d 579 (1960); *Northwest Airlines* v. *Rowe*, 226 F.2d 365 (1955); *Kamienski* v. *Bluebird Air Service*, 53 N.E.2d 131 (1944), confirmado en 59 N.E.2d 853 (1944); Anotación *"Res Ipsa Loquitur in Aviation Cases,"* 6 A.L.R.2d 528, 529. Kreindler en su *Aviation Accident Law* (1963), Vol. 1, pág. 103, expresa "Está perfectamente claro que la doctrina de *res ipsa loquitur* se aplica a accidentes de aviación." También escribe el mismo autor, en el mismo lugar, a la pág. 177 que "no hay razón alguna por qué dicha doctrina no se aplique a casos de aviones privados."

Cuando la causa del accidente puede ser explicada la

---

([19]) *Wilson* v. *Colonial Air Transports*, 180 N.E. 212 (1932); *Herndon* v. *Gregory*, 81 S.W.2d 849 (1935); *Morrison* v. *Le Tourneau*, 138 F.2d 339 (1943); *Smith* v. *Whitley*, 27 S.E.2d 442 (1943); *Towle* v. *Phillips*, 172 S.W.2d 806 (1943).

situación en cuanto a responsabilidad se refiere, puede, desde luego, ser distinta. Prosser, obra citada, pág. 221.

El argumento de las demandadas de que el avión en el caso de autos tenía controles duales no puede variar el resultado. No hay el más leve indicio en la prueba de que el pasajero que iba sentado al lado del piloto—el Lcdo. Fornaris— intentase pilotar el avión. Por el contrario, hay prueba en el récord en el sentido de que dicho pasajero no era aficionado a pilotar aviones y de que ese deporte no le interesaba. Claro, existe la *posibilidad* matemática de que Fornaris hubiese pilotado, pero eso, en vista de la prueba, no es lo *probable*. La ley brega con probabilidades y no con posibilidades. Las posibilidades hipotéticas son prácticamente infinitas. La existencia de controles duales *per se* no deja necesariamente indefensos a los demandantes. V. *Drahmann* v. *Brink*, 290 S.W.2d 449 (1956); *Boise* v. *Larsen*, 214 F.2d 373 (1954).

Concluimos, pues, que se aplica la ley del foro y la doctrina de *res ipsa loquitur*. No encontramos errores que justifiquen la revocación de la sentencia apelada. En cuanto al recurso de los apelantes sobre honorarios de abogado, no creemos que el Juez de instancia abusó de su discreción y por lo tanto tampoco vamos a revocar esa determinación suya. *Se confirmará la sentencia dictada en este caso por el Tribunal Superior, Sala de San Juan, en 27 de agosto de 1963, según modificada por dicho Tribunal en 20 de noviembre de 1963.*